SMITH, Respondent, v. FIRST NATIONAL BANK, Sherman, Appellant.

(239 N. W. 842.)

(File No. 6554. Opinion filed December 19, 1931.)

*Boyce, Warren & Fairbank,* of Sioux Falls, for Appellant.
*Bielski & Elliott,* of Sioux Falls, for Respondent.

CAMPBELL, J. The facts in this case are undisputed. During and prior to October, 1925, the Farmers' Savings Bank of Sherman (hereinafter called the Farmers Bank) was a state bank operating at Sherman, S. D., and the First National Bank of Sherman (hereinafter called the National Bank) was a national bank operating in the same town. These banks had been accustomed to clear with one another. The latter part of September or first part of October, 1925, a published report of the Farmers' Bank indicated that its reserve was extremely low and much under the legal limit. This situation was discussed shortly thereafter at a meeting of the directors of the National Bank, and they instructed the cashier of the National Bank that in future clearings with the Farmers' Bank, when the clearing balance was in favor of the National Bank, he should insist upon receiving either cash or a guaranteed check therefor.

The previous custom had been to accept settlement of the clearing balance by draft upon some outside bank, and the Farmers' Bank had usually settled its clearing balance by giving a draft upon the Security National Bank of Sioux Falls, S. D., or the Pipestone National Bank of Pipestone, Minn. On October 21st the National Bank had for clearing and collection checks drawn upon the Farmers' Bank aggregating approximately $2,400. The cashier of the National Bank presented these checks to the Farmers' Bank, and, pursuant to the instructions of his directors, demanded either cash or guaranteed check therefor. The officers of the Farmers' Bank were unable (or at least unwilling) to comply with this demand, and the cashier of the National Bank took the checks away with him. That evening there was a meeting between the president and cashier of the National Bank and the vice presi-

dent of the Farmers' Bank. The officers of the National Bank stated that they were no longer willing to accept drafts upon out of town banks in settlement of checks upon the Farmers' Bank which they presented to that bank for collection and payment; that they would either have to have cash for such checks when presented, or, if it was desired that they should continue to accept drafts therefor, they would have to have some security; that, if their demands were not acceded to, they would return the checks to the parties from whom they had received them for collection.

After some discussion, the vice president of the Farmers' Bank agreed to assign to the National Bank a certain promissory note in the principal sum of $4,000 executed by one Locke and wife to the Farmers' Bank, together with a real estate mortgage securing the same, to be held by said National Bank as collateral security to guarantee the payment of such drafts as the National Bank might take in settlement of checks drawn upon the Farmers' Bank which the National Bank received from its customers and presented to the Farmers' Bank for collection and payment.

Pursuant to that agreement, on the morning of the 22d the Farmers' Bank turned over to the National Bank the Locke note and a duly executed and acknowledged assignment of the mortgage securing the same. This having been done, the cashier of the National Bank again presented to the Farmers' Bank the checks upon the Farmers' Bank aggregating $2,400 which had been presented the previous day, and accepted a draft for the amount thereof. This draft was sent through the regular channels, and was cleared and paid in due course. Again on the 22d and on the 23d and 24th of October checks upon the Farmers' Bank were presented to said bank for collection, and payment by the National Bank and drafts were given therefor, all of which drafts were honored in due course.

On October 26, 1925, the National Bank presented to the Farmers' Bank for collection and payment checks drawn on the Farmers' Bank aggregating $458.60, and received for such checks a draft upon the Security National Bank of Sioux Falls for said amount. This draft was not paid when presented, and, after having been several times presented and never paid, was finally returned to the National Bank because the Farmers' Bank did not

have in the Security National Bank of Sioux Falls sufficient funds for the payment thereof.

On October 27th, 28th, 29th, and 30th checks were presented by the National Bank to the Farmers' Bank for collection and payment, drafts were given for the amount thereof, and each of said drafts was honored and paid in due course. On October 31, 1925, the National Bank presented to the Farmers' Bank for collection and payment checks drawn on said bank, and received therefor a draft drawn on the Pipestone National Bank in the amount of $1,038.16. This draft went through the usual channels, but was not honored on presentation, and was protested for nonpayment, the protest fees amounting to $1.79.

On November 3, 1925, the Farmers' Bank was closed and taken over by the superintendent of banks for liquidation as an insolvent bank.

When payment was refused upon the draft of October 26, 1925, upon the Security National Bank for $458.60, the National Bank did not treat such refusal of payment as final dishonor of the draft, but continued its efforts, which ultimately were unsuccessful, to collect the draft.

When the draft upon the Pipestone National Bank in the amount of $1,038.16, given on October 31, 1925, in settlement for check presented for collection and payment on that day, was dishonored, the National Bank promptly caused the same to be protested for nonpayment, and charged back to its customers items therein represented in the aggregate amount of $954.42.

Whether, as between the National Bank and its customers, this charging back was proper and lawful is not before us, and we express no opinion thereon.

Summarizing, it appears that on October 26 and October 31 checks drawn upon the Farmers' Bank by sundry depositors therein were presented to said drawee bank for collection and payment by the National Bank as agent of the respective payees or holders of said checks. Instead of demanding and receiving money in payment of said checks, the collecting agent, the National Bank (whether rightly or wrongly as between said bank and its principals we do not undertake to say), took upon settlement thereof the two drafts above mentioned. Both drafts were ultimately dishonored, and upon dishonor the collecting agent, the National Bank (whether

lawfully or not we do not undertake to decide), charged back upon its books to its principals an aggregate amount of $954.42. As to the remainder of the amount in the two drafts, $542.34, the National Bank has undoubtedly paid that sum, or become liable for the payment thereof, out of its own funds to its principals, the original check holders. The National Bank has likewise paid out of its own funds a protest fee of $1.79.

After the closing of the Farmers' Bank, the National Bank caused to be placed of record its assignment of the Locke mortgage, and thereafter the present action was instituted by the superintendent of banks against the National Bank as defendant for the recovery of the Locke note and mortgage, claiming that the transfer and assignment thereof was illegal and in violation of the provisions of section 8984, Rev. Code 1919, and acts amendatory thereof.

By its answer defendant National Bank set forth the facts substantially as hereinbefore related, and maintained the position that it held and was entitled to hold the note and mortgage as security for the payment of the two drafts hereinbefore described in the aggregate amount of $1,496.76, together with protest fees in the amount of $1.79, and interest thereon, and the prayer of the answer was:

"Wherefore, this defendant prays that the plaintiff take nothing by its said complaint and that the prayer of the plaintiff be denied, and that it be held that this defendant is the legal holder of the said note and mortgage as security for the payment of the two drafts set out herein and entitled to hold the same until the said draft, protest fees and interest on said drafts at 7% from their date are paid; and for such other and further relief as is equitable, besides the costs of this action."

The case was tried to the court without a jury, and findings, conclusions, and judgment were in favor of plaintiff upon all the issues. The judgment was for a reassignment and return of the Locke note and mortgage to the plaintiff, from which judgment and from an order denying its motion for a new trial defendant has appealed.

Appellant by apt assignments of error presents three main contentions: First, that the assignment of the note and mortgage to appellant was not illegal or void under section 8984, Rev. Code

1919, and amendatory acts; second, that, even if the transaction was illegal, nevertheless plaintiff cannot recover the collateral without first repaying to appellant the money which it advanced relying upon the collateral; and, third, that appellant has a right to hold the collateral as security for the payment of the full amount of the two drafts aggregating $1,496.76, notwithstanding the fact that it has charged back $954.42 thereof to its customers from whom it received said checks for collection.

The law in effect at the time of the transactions in question was section 8984, Rev. Code 1919, as amended by chapter 124, Laws 1919, as amended by chapter 92, Laws 1925, and the portion of the statute material in this case is as follows:

"No bank shall give preference to any depositor or creditor by pledging the assets of the bank as collateral security * * * provided further, that any bank may borrow money for temporary purposes, and may pledge as collateral security therefor the assets of such bank in an amount not to exceed fifty per cent in excess of the paid-up capital and surplus of said bank. * * * In all cases where money is borrowed, a bank shall issue its "bills payable' and shall show the true amount of borrowed money on its books, and in all reports and statements required by the provisions of this chapter, under 'bills payable.' "

This action is predicated upon a violation of the above statute and not upon the "trust fund" theory (by virtue of which theory it has been held that the assets of an insolvent corporation constitute a trust fund for the benefit of its creditors and no one of said creditors can be preferred to another). This court has held in Hirning v. Toohey, 49 S. D. 496, 207 N. W. 462 (affirmed on rehearing 50 S. D. 457, 210 N. W. 723) that the word "preference" in the above statute is used in a popular and not a technical sense, and that the intention of the statute is to prohibit the pledging of the assets of a bank, excepting in certain specified instances set out in the statute, without regard to the solvency or insolvency of the bank at the time of the transaction.

When the various checks which the National Bank subsequently presented for collection were issued (assuming, as is the clear inference from this record, that each drawer of a check had deposit credit in equivalent amount with the Farmers' Bank), the relation of debtor and creditor existed between the Farmers' Bank and

the drawers of the checks, whereby the Farmers' Bank was debtor in an amount equal to the aggregate of the checks, and the respective drawers of the checks were creditors each in an amount equal to the checks drawn by him. Suppose that each check holder individually presented his check or checks for payment to the Farmers' Bank and, instead of demanding and receiving cash, accepted a draft therefor, in other words, accepted the credit of the Farmers' Bank. Thereby, in substance, as to each check a novation would be accomplished. Cf. Riggen v. Lindley, 58 S. D. 343, 236 N. W. 280. From the point of view of the drawer of the check, his liability to the payee would be discharged and his credit with the bank correspondingly diminished. From the point of view of the payee of the check there would be merely an exchange of debtors. Instead of having the drawer of his check as his debtor, he would have as his debtor the Farmers' Bank which issued the draft. From the point of view of the bank, there would be merely an exchange of creditors. Instead of owing the original depositor who had drawn the check, it would now owe the payee of the check to whom it had issued its draft. Neither the assets nor liabiilties of the bank would increase or diminish. In the instant case the checks, instead of being presented personally by the holders, were presented by the National Bank as agent of the holders. The National Bank as agent accepted drafts in settlement for the checks instead of cash. Whether the acceptance of drafts for these checks was proper as between the National Bank and its principals who had intrusted the checks to it for collection is not before us, nor are we concerned in this case with any question of the rights and liabilities which might arise between the National Bank and its principals by reason of such conduct on the part of the National Bank. When the checks were surrendered to the drawee bank, marked, paid, charged to the account of the makers, and drafts for the aggregate thereof delivered to the National Bank as agent for the respective check holders, there was no change in either the assets or liabilities of the Farmers' Bank. Previous to the transaction it owed the amount of the checks to the drawers thereof. Subsequently to the transaction it still owed the same amount, but owed it to some one else. Whether the new creditor, under the facts and circumstances appearing upon this record, would be found, in strictness, to be the check holders represented by their

agent, the National Bank, or the National bank as agent in trust for its principals, the check holders, or the National Bank without regard to the check holders, is a question that we need not undertake to determine, and that is in no manner material to the decision of this case. We may therefore accept for the purposes of this opinion (and without any attempt to ascertain whether it is technically correct or not) the view of appellant that the new creditor was the National Bank.

Appellant maintains that there was no violation of the statute because appellant bank was not a creditor of the Farmers' Bank when it received the collateral in question; that appellant received the collateral when no relation of debtor and creditor existed and thereafter became a creditor on the faith of said collateral. This, if true, is immaterial. The statute in question plainly contemplates (with certain specific exceptions not here material) that the only situation wherein the assets of a bank may be pledged as collateral security (in a limited amount) is when the bank actually borrows money for temporary purposes. The prohibition of the statute is as effective at the inception of the relation of debtor and creditor as it is during the existence of such relation, excepting only when the relation arises out of the borrowing of money. The bank cannot lawfully pledge its assets to one who is already a depositor or creditor. Neither can it lawfully pledge its assets to one who is neither for the purpose of inducing him to become either, save only in the case of borrowing money.

Appellant maintains that the transaction amounted to lending the money or credit of appellant to the Farmers' Bank for temporary purposes and to a pledge of the assigned note and mortgage as collateral security for such temporary loan of credit or money. Certainly, as to the amount of $954.42 which appellant attempted (and successfully so far as we know) to charge back to its own customers when the drafts were dishonored, appellant did not loan any money or credit to the Farmers' Bank. Assuming, however, that, as a result of the transaction, it might be said (and conceivably it could to the extent of the $542.32 which appellant paid its customers and did not charge back to them) that appellant had advanced its money or credit to the Farmers' Bank, still we think the prohibition of the statute would prevent the lawful pledge of

the collateral under the circumstances of this case. The statute provides that a bank may borrow money for temporary purposes and may pledge a limited amount of assets as collateral security therefor, but as part and parcel of the same statute it is provided that when money is borrowed the borrowing bank shall issue its bills payable and shall show the true amount of borrowed money on its books, etc. None of these requirements were met in the instant case. We think the permission of the statute to pledge a limited amount of assets for borrowed money must be limited to cases where the borrowing of money is accomplished and evidenced in the manner specified in the statute, and not otherwise. Appellant was chargeable with knowledge of the statute. If appellant desired to loan money to the Farmers' Bank and hold assets in pledge for the loan, it should have proceeded to make the loan in the manner and form contemplated by the statute.

We are therefore of the opinion that the entire transaction with reference to the pledging of the collateral in question was illegal and within the prohibition (and without the permission) of section 8984, Rev. Code 1919, as amended.

Appellant maintains that, even if the transaction by which it acquired possession of the Locke note and mortgage be held illegal, nevertheless a court should not adjudge the return of such collateral except on condition that appellant be first restored to the position its would have been in had the transaction never occurred, and in this connection appellant in its brief says:

"It would seem to us that a court of equity would say, 'If this was an illegal act on your part, you cannot take advantage of it. You have received $1,496.76 in cash by reason of this illegal act; you have put up this note and mortgage to secure the repayment of this sum, and a court will not assist you in getting back this collateral unless you restore the other party to the position which it would have been in if you had not put up the collateral.'"

Very clearly the transaction did not, to any extent whatever, augment the assets or diminish the debts of the Farmers' Bank. The bank received no cash. Before the transaction occurred, the Farmers' Bank owed $1,496.76, and it still owes that amount. It merely exchanged creditors. And certainly on this record, so far as concerns $954.42 of the amount involved, appellant has parted with nothing whatever. To the extent of $544.13 appellant may

have parted with its money, but appellant's money did not go to the Farmers' Bank, and did not increase the assets or decrease the liabilities of that bank.

Appellant also invokes the doctrine that the law will not aid either party to an illegal agreement, but will leave the parties where it finds them, and that, if the transaction in question was illegal, both banks were parties to the illegality, and neither is entitled to the aid of a court in undoing it, and appellant cites the language of this court in the case of Bon Homme County Bank v. Dakota National Bank, 50 S. D. 191, 208 N. W. 825, 827, as follows:

"In thus disposing of the case we do not hold such a transaction between banks to be legal. It is illegal, but in a suit brought on behalf, and in the name, of the other party to the illegal and fraudulent transaction, there can be no recovery in favor of one co-conspirator against the other."

The cases are not, we think, precisely similar. The Farmers' Bank is now insolvent, and the superintendent of banks is in charge thereof for purposes of liquidation, and it is his duty under the law to get in the assets of that bank wherever he may find them. The Locke note and mortgage constitute an asset of the Farmers' Bank, discovered in the hands of appellant, whose only hold upon it is the claimed right to enforce a certain agreement of pledge which was illegal and in violation of a specific statute in its inception. If the only claim by virtue of which appellant seeks to retain possession of this asset of the Farmers' Bank is illegal and not recognizable as a valid claim in a court of law, it would seem that the asset ought to be returned to the superintendent of banks for the purposes of liquidation.

 It is the broad general rule (subject, of course, to certain exceptions) that the rights of a creditor as to the property of his debtor are derivative, and are no better than the rights of the debtor himself. That was the situation in the Bon Homme County Bank Case, supra. That action was brought against the defendant to recover the sum of approximately $28,000 credited on the books of defendant as a deposit of the Bon Homme County Bank. Defendant claimed that, as a matter of fact, this apparent book credit did not represent a deposit because of certain arrangements entered into between the two banks at the time the book credit was entered. Under the circumstances of that case, the

rights of creditors were in no manner superior to the rights of the Bon Homme County Bank. If the circumstances were such that the Bon Homme County Bank could not recover, its creditors had no better right (excepting only such creditors as knew of this ostensible deposit credit and were deceived thereby into becoming creditors of the Bon Homme County Bank when they would not otherwise have done so, and on the record in that case it failed to appear that there were any such creditors). \

The superintendent of banks in charge of an insolvent bank represents both the bank and the creditors thereof, but his rights with reference to transactions which took place prior to his taking over of affairs are the same as the rights of the persons whom he represents. In the Bon Homme County Bank Case, whether the superintendent of banks be regarded as representing the creditors or as representing the Bon Homme County Bank, the measure of his rights was identical, and the yardstick to be applied was the right of the Bon Homme County Bank, and the case was properly ruled accordingly.

In the instant case, the rights of creditors are not identical with the rights of the Farmers' Bank. Here the Farmers' Bank violated a specific statute forbidding the pledging of assets. Conceding that a court might not set aside the transaction in the suit of the Farmers' Bank as a going concern because of its own wrongdoing in the matter, nevertheless, the Farmers' Bank having become insolvent, the rights of creditors are now involved. If the Farmers' Bank was a wrongdoer in pledging its assets, it dealt with its assets to that extent in fraud of its creditors. The creditors did not participate in such wrongdoing, and are not bound thereby . The creditors, under the circumstances of this case, and by virtue of the existence of the statute, have a right upon their own part, and separate and independent from any rights of the Farmers' Bank, to have assets of the Farmers' Bank, illegally pledged by it, returned into the estate of the insolvent bank for the benefit of creditors. The superintendent of banks represents that right in this case, and is entitled to recover the asset in question free of appellant's illegal claim against it in his capacity as representative of creditors, even though the Farmers' Bank itself as a going concern might not be so entitled, and even though the superintendent of banks solely as a representative of the Farmers' Bank might

not be so entitled. Conceding that appellant may be right in its contention that the Farmers' Bank and the National Bank were in pari delicto as to the illegal transaction between them, nevertheless we are of the opinion that there is sufficient public interest in having the statute forbidding the pledging of bank assets enforced according to its terms to justify and, in fact, require a court, when a bank has become insolvent and is in process of liquidation, and it is discovered that certain of its assets are outstanding upon illegal pledge, to order the return of said assets for the purpose of liquidation, regardless of the claims of the illegal pledgee, and not to permit the statute to be circumvented by allowing such pledgee to retain possession of such assets and enforce his illegal pledge agreement with substantially the same practical effect as if it had been a valid agreement.

We think, therefore, that the learned trial judge ruled the matter correctly in ordering the return of the note and mortgage here involved, and the judgment and order appealed from are affirmed.

POLLEY, P. J., and ROBERTS, WARREN, and RUDOLPH, JJ., concur.