## No. 13,189.

WALTHER *v*. McFERSON ET AL.

(20 P. [2d] 552)

Decided March 13, 1933.

Mr. Earle Bryant, for plaintiff in error.

Messrs. Moynihan, Hughes & Knous, for defendants in error.

*En Banc.*

Mr. Justice Burke delivered the opinion of the court.

Plaintiff in error is hereinafter referred to as Walther, defendant in error McFerson as the commissioner, the Bank of Ridgway as the Ridgway bank, the Citizens State Bank of Ouray as the Ouray bank, the Rubey National Bank of Golden as the Golden bank, and Carroll M. Stanwood as Stanwood.

The commissioner brought this action against Walther to recover assets of the Ridgway bank which, it was alleged, he had received from Stanwood, its cashier, just preceding its closing, in contemplation of its failure, with knowledge, and with intent to prevent the application of such assets to the bank's liabilities. A jury returned its verdict for the commissioner and judgment was entered accordingly. To review that judgment Walther prosecutes this writ.

About January 1, 1918, Walther, who had been engaged in banking for many years, sold the Ridgway bank to five men. Stanwood, one of these, became its cashier and continued to operate it until it closed. Walther became a stockholder in the Ouray bank and was a depositor in both.

During all of 1931, the Ridgway bank had borrowed up to its legal limit. Seven months before it closed Walther, knowing that fact, negotiated a $5,000 loan from the Golden bank, evidenced by Stanwood's note and secured by Walther's collateral. Stanwood then assured him

that Ridgway bank collateral would be furnished him on his request, but no such collateral was then selected or agreed upon. By Stanwood's direction this $5,000 was deposited by the Golden bank in the First National Bank of Denver to the credit of the Ridgway bank. Stanwood thereafter appropriated $800 of it and used the balance to replace sums he had unlawfully taken from the accounts of various depositors in his bank. This loan never appeared on the books of the Ridgway bank, save as there disclosed by the deposit, did not appear in its published statements, nor its reports to the commissioner, nor were the directors told of it.

December 5, 1931, Stanwood received a demand from his bank's principal creditor to pay or put up additional security. He communicated this fact to Walther, then his dinner guest, telling him he could not comply with it and keep going. Two days later Walther was in the Ridgway bank and certain notes of the face value of $4,000 were selected by him and Stanwood from the bank's note book and placed in Walther's note box, which was kept open in the bank, accessible at all times to Stanwood. On the morning of Saturday, December 12, 1931, Stanwood and Walther met and arranged that before noon, when the banks would close for the day, $1,000 of the Ridgway bank's funds on deposit in the Ouray bank should be transferred by 'phone by Stanwood to the account of Walther in that institution. This was promptly done and Walther so advised. At that time Stanwood knew his bank was insolvent and that he would that day turn it over to the commissioner. When the transfer was made at the Ouray bank it left less than $30 in the Ridgway bank's account there. When the Ridgway bank closed at noon Stanwood called the commissioner by 'phone and placed the institution in his hands. Possession was actually taken by that official on the following Monday. When Stanwood went from the bank to his home on the afternoon of December 12, he took with him Walther's note box and that evening he sent for the lat-

ter, gave him the box with its contents, and told him the story of the bank's condition, the cause of it, and its closing.

■ The assets here sought by the commissioner are the notes obtained by Walther on December 7, and the $1,000 obtained by him on December 12. Walther contends that he is entitled to the notes under his agreement with Stanwood at the time the Golden bank loan was negotiated, and to the $1,000 as having been paid to him in the usual course of business while the Ridgway bank was still running. The direct testimony, coming from Walther and Stanwood only, is that the former at no time, before Saturday evening, December 12, knew the Ridgway bank was insolvent. Since the jury was instructed on the theory that such notice was immaterial we assume the truth of that testimony, though the undisputed facts disclose that no man in Walther's position could reasonably have been ignorant of that insolvency. Since the jury was also instructed that it could return no verdict for the commissioner unless it found the Ridgway bank insolvent from December 7 to December 12, 1931, inclusive, and since from the evidence it could not have found otherwise, we accept that fact. Hence if we hold, as we do, that the delivery of the notes to Walther on December 7, and the $1,000 on December 12, out of the assets of this insolvent bank, constituted an unlawful preference, we need consider no other questions presented, and must affirm this judgment.

This record is a long one and we pass over, as immaterial to our consideration and conclusion, much of the evidence. It tells the story of years of looting of the Ridgway bank by its cashier, and the thin covering of his defalcations by simple manipulations and technical terms. A little curiosity concerning the source of the mysterious $5,000 which suddenly appeared in the books of this little bank in May, 1931, and the reason for it, would have necessitated the closing of the institution at that time. Its statutory borrowing limit was $15,000, yet

when it did close, accepting its assets at their book value and its admittedly worthless notes as such, it revealed a shortage of over $70,000. Stanwood has apparently paid in part for his peculations, since his testimony is given by deposition, taken at Canon City, the location of the state penitentiary.

It must be borne in mind that the respective rights of the commissioner and Walther to the questioned collateral are not to be tested here by the rules applicable in an action between Walther, seeking to enforce the promise of Stanwood, and the Ridgway bank, still solvent. With this distinction go many authorities cited in the brief of counsel for Walther, for this reason not in point.

The assumption of Walther's ignorance of the insolvency of the Ridgway bank does not go to his lack of knowledge of the character and purpose of the Golden bank loan. Of course if that were a personal loan to Stanwood, Walther could claim no bank assets as security. He insists it was a loan for the Ridgway bank, made in the name of its cashier to evade the prohibition of the statute. Hence, putting this transaction in the light most favorable to him, the notes in question were transferred in compliance with the promise of Stanwood, acting for his bank, to secure a debt due from it to the Golden bank, which Walther knew at the time was being so negotiated as to conceal the facts and deceive the commissioner.

Three times each year the Ridgway bank was obliged to report to the commissioner, and publish, in detail, its liabilities. S. L. 1927, p. 201, c. 65, §4. It did not so report or publish this Golden bank loan. Had it done so the commissioner would have closed it. Failure to report, or falsely reporting, or being instrumental in so doing, constitutes a felony. C. L. 1921, p. 866, §2674; S. L. 1927, p. 207, c. 65, §17. The purpose of this loan then was to deceive the commissioner in his performance of an official duty. Such contracts are contrary to public policy and void. 13 C. J., p. 499, §443; *Farmers & M. State Bank v. Perry*, 186 Wis. 93, 202 N. W. 179. Since

at the date of the Golden bank loan and Stanwood's promise concerning future collateral, no collateral was designated, selected, delivered or set aside, the contract for it was not executed, it created no lien, was limited by the statute, and invalid when the bank became insolvent. *Citizens State Bank v. First National Bank,* 98 Kan. 109, 157 Pac. 392.

■ ■ "No bank shall sell, assign or transfer any of its assets when insolvent, or in contemplation of insolvency, with the intention of preferring any creditor or preventing the application of such assets to the satisfaction of its debts, * * *." C. L. 1921, p. 871, §2697. "A bank shall be deemed insolvent (a) when the actual cash market value of its assets is insufficient to pay its liabilities other than its own capital stock, surplus and undivided profits, or (b) when it is unable to meet the demands of its creditors in the usual course of business." Id. §2698. Since the notes in question remained, on December 7, 1931, the property of the Ridgway bank, and since that bank was then insolvent, their transfer to Walther was a plain violation of said section 2697. Said section does not expressly declare such transfers void as against the assignee, but under a similar statute it has, correctly we think, been so held. *Citizens State Bank v. First National Bank, supra.* That authority, and said section 2697, also apply to the $1,000 transferred to Walther a few hours before the final closing of the Ridgway bank. The only question remaining is, Was notice to Walther of the insolvency of the bank essential to invalidate the transaction, if otherwise legal? The statute does not say so and the federal courts have refused to read such a qualification into similar acts. *Ball v. German Bank,* 187 Fed. 750, 752; *National Security Bank v. Butler,* 129 U. S. 223, 9 Sup. Ct. 281, 32 L. Ed. 682.

We have not overlooked *McDonald v. Chemical National Bank,* 174 U. S. 610, 19 Sup. Ct. 787, 43 L. Ed. 1106, probably the strongest authority cited by counsel for Walther. That case was a difficult one. The question

was close and three of the justices dissented. It differs, however, in several material facts from the instant case, and there is a material difference between the federal statute there under consideration and ours. The acts there complained of were not done in contemplation of insolvency, while the contrary is true here. The statute there under consideration applied to transactions consummated by the bank not "when insolvent" as ours, but "after the commission of an act of insolvency or in contemplation thereof," which may mean an entirely different thing.

At the close of all the evidence counsel for the commissioner moved for a directed verdict. For the reasons above given that motion should have been sustained. The result would then have been the same as that reached through the return of the verdict.

The judgment is affirmed.