E. H. LUIKART, RECEIVER, APPELLEE, V. BARBARA HUNT, APPELLANT.

FILED APRIL 7, 1933.   No. 28512.

*J. A. Donohoe*, for appellant.

*F. C. Radke, I. J. Dunn, Frank Warner* and *Barlow Nye, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ.

GOSS, C. J.

This is the first in a series of four similar cases argued the same day and involving preferences to favored depositors by an insolvent bank. From a judgment in this suit canceling the bank's transfer and assignment of a note and mortgage to defendant, ordering them reconveyed to the receiver, and enjoining any other assignment or any attempt to collect them, defendant appeals. The decree awarded defendant the amount of the note and

mortgage as a valid claim for a deposit entitled to share with all the other general depositors of the bank in the general assets thereof.

The transaction complained of took place on November 22, 1930. This depositor, Barbara Hunt, had been a customer of the bank for many years and had about $7,000 of deposits evidenced by certificates. In December, 1929, or January, 1930, she consulted the bank officers about investing part of the money in other securities. She first spoke to the cashier about it. He said she would have to talk to James C. Flannigan, the vice-president of the bank, who was then absent. Not long after that she conferred with Mr. Flannigan, who advised her to get a real estate mortgage. He told her some one would need some money before long and he would be on the lookout and would let her know. She heard nothing further on the subject until November 22, 1930, when she was on the sidewalk in front of her place, and the cashier stopped his car and told her Mr. Flannigan wanted to see. her at the bank that afternoon. She went to the bank and dealt with Mr. Flannigan. As a result of negotiations, he then and there assigned and transferred to her a $3,000 mortgage and note on a quarter section of Holt county land. The note and mortgage were executed on November 3, 1930, by Walter Clare and wife in favor of the Citizens Bank of Stuart. The assignment in the name of the bank was executed by James C. Flannigan, Vice-President, and attested by Thomas S. Mains, Cashier, on November 22, 1930. In exchange Mrs. Hunt turned over one certificate of deposit for $1,410.44, which had become due the day before, another certificate for $1,295.15 to become due December 26, 1930, and a third certificate for $357, to become due March 22, 1931. In the adjustment she received a new certificate of deposit for $100 and $14.76 in cash. She also had other certificates on the bank for $4,000. On the trial it was stipulated that the bank had conveyed the farm to James C. Flannigan on June 29, 1927, and he had conveyed it to Walter Clare

on November 3, 1930, the same day Clare and wife executed and delivered to the bank the note and mortgage in question. They were assets of the bank. Mrs. Hunt had never before bought any notes, mortgages, or bonds from the bank. The evidence does not show that Mrs. Hunt had actual knowledge or notice that the bank was insolvent.

The receiver alleged that, at the time of the transfers, the bank was insolvent and its officers and defendant Hunt had notice and knowledge thereof; that the assets of the bank were a trust fund for all its creditors and the officers of the bank had no right to make the transfers; that said transfers were not in the ordinary course of business, were in violation of the laws of Nebraska with reference to banks and insolvency and were null and void; and that the transfers of the note and mortgage to Barbara Hunt constituted an unlawful preference. Mrs. Hunt denied the material allegations of the petition, alleged she purchased the note and mortgage in good faith for a valuable consideration, paid for them by a surrender of the certificates of deposit, and had no notice or knowledge of the insolvency of the bank. Plaintiff for reply denied new matter. The trial court found generally for plaintiff, but left "open the question of the knowledge of the defendant Hunt with reference to the insolvency of said bank for the reason that said question is immaterial."

The evidence shows that the bank had been impaired, and the officers had known it, for a long time. They recognized it as early as July 30, 1930, when they met at the banking department by request of George W. Woods, state bank commissioner, and went over the affairs of the bank with him and the chief examiner. In that conference it was discovered that at the most favorable appraisal the assets of the bank were worth $122,000 less than they purported to be. Its capital was impaired and they were notified to make it good. The commissioner polled the officers and they personally pledged themselves

to eliminate the particular assets and to put that amount of real money in their place. On that occasion the cash reserve was low. It should be at least 15 per cent. of the deposits. Comp. St. 1929, sec. 8-134. It was less than 9 per cent. They promised also to bring the reserve up. Incidentally, the reserve was less than 3 per cent. on November 22, 1930. They did not keep their pledge to restore their impaired capital and in November they began with Mrs. Hunt their practice of paying favored depositors out of the good assets in their note case. The bank was then definitely insolvent and the officers knew it. The bank closed December 1, 1930. The department of trade and commerce put it in the hands of an agent. The receiver was appointed January 8, 1931.

A state bank is insolvent when the actual cash value of its assets is insufficient to pay its liabilities to its depositors, or when it is unable to meet the demands of its creditors in the usual and customary manner, or when it shall fail to make good its reserve as required by law, or when the stockholders, upon notice from the department, shall fail to make good an impairment of its capital. Comp. St. 1929, sec. 8-116.

The power of the state over banking arises out of the fact that it is a quasi public business. The authority in this state to regulate and control the business of banking resides in that fact duly declared by the legislature. The general definition of banking is coupled with the declaration. Comp. St. 1929, sec. 8-114. The machinery to carry out the regulation, supervision and control of the banking business is provided by statute. Banking may be carried on only by a corporation duly organized for such purpose under the laws of this state. Violations of the law are subject to penalties, including receivership and winding up of the business.

Whenever the practices or condition of a state bank are such that it is taken charge of by the department of trade and commerce, all attachment liens acquired within thirty days are dissolved. Comp. St. 1929, sec. 8-181.

And notice of possession of a bank by the department forestalls all future liens, unless the bank be continued as a going concern. Comp. St. 1929, sec. 8-187. If a receiver be appointed, the affairs of the bank are closed up by him under the supervision of the court in accordance with the provisions of law.

The general rule of law, as stated by defendants in several of this series of cases and supported by citations from other jurisdictions, to the effect that a receiver of an insolvent bank is merely an assignee, that he has only such rights as the bank had, so that the rights of third parties are not increased, diminished or varied by his appointment, that he stands in no better position than did the bank as a going concern, and the like, has certain qualifications and conditions in this jurisdiction.

This is the rule here: "Ordinarily a receiver takes charge of banking affairs where the bank left them, and cannot generally, in absence of fraud, mistake, or violation of law, open closed transactions which would conclude the bank, if solvent." *State v. South Fork State Bank,* 112 Neb. 623; *State v. Farmers State Bank,* 112 Neb. 788; *State v. American Exchange Bank,* 112 Neb. 834. The implication from this statement of the rule is that, if fraud or a violation of law inheres in a preference, by an insolvent bank, of one depositor over the mass of depositors, then the receiver may assert that fraud or violation of law as against one who has received a preference.

The functions of a bank are to receive deposits from its customers, to keep them safe, and to repay them when demanded and due. To compensate for this service the bank invests its capital and the money intrusted to it by its depositors. The integrity and the continued existence of a bank depend upon the good-will of the depositors. That good-will is secured and held by the idea and practice of equality of treatment of depositors with preferences to none. The legislature was so careful to protect the rights of depositors in the fund they create that,

when a bank becomes insolvent and closes, the claims of unsecured depositors and holders of exchange have priority over all other claims, except taxes, and become a first lien on all the assets of the bank. Comp. St. 1929, sec. 8-1,102. The funds of depositors are received by a banking corporation with the knowledge and notice given by this wise principle of the law, not only to the officers of the bank, but to every depositor, that all assets of the bank, which are largely created by these deposits, will always be a fund subject to *pro rata* repayment to depositors, whenever the bank ceases to function as a going concern and to pay its depositors in the ordinary course of business. With such a spirit and understanding of the law, may the officers of a bank, knowing its insolvency, realizing that its receivership is imminent, thus prefer certain depositors over all others by the subterfuge of trading the best assets in the bank's note case for deposits, in some instances not yet due? We think not. To decide otherwise would be a manifest travesty upon justice. The mere announcement of such a rule would be at once an invitation to and condonation of recreant and conscienceless bank officers. It would authorize and encourage them to plunder their banks and to carve out and apportion to a chosen few the choicest assets of the corporation, leaving to the other depositors and creditors little more than a myth or shadow to which they may resort for the payment of their claims. We reject the idea, and are of the opinion that the officers of the bank committed a fraud upon the other depositors and violated the law when they took the note and mortgage out of the bank's note case and traded it for Mrs. Hunt's certificates of deposit.

If within the limits of section 8-136, Comp. St. 1929, or if beyond that, by permission of the department, the bank might have rediscounted the note and mortgage to third parties. That would have been a lawful method by which it could have disposed of the note and secured cash to increase its depleted reserve without lessening

its assets. But this transaction was entirely out of the ordinary course of business of a bank. The law and the facts put Mrs. Hunt upon her notice. We are of the opinion that, as a matter of law, she was charged with notice of the unlawful act of the bank and of its fraud upon the other depositors, and so the district court was right in holding that the question of the knowledge of Mrs. Hunt as to the insolvency of the bank was immaterial.

The district court correctly allowed her a depositor's claim. The judgment of the district court was in all things right and it is

AFFIRMED.