HADLOCK, State Bank Com'r, v. CALLISTER.

No. 5405.   Decided January 8, 1935.   (39 P. [2d] 1082.)

_W. B. Higgins,_ of _Fillmore,_ and _J. D. Skeen,_ of Salt Lake City, for appellant.

_Sam Cline,_ of Milford, for respondent.

EPHRAIM HANSON, Justice.

This is an action in claim and delivery brought by the state bank commissioner in charge of the liquidation of the State Bank of Millard County, hereinafter referred to as the bank, to recover possession of three promissory notes secured by mortgages, and one unsecured promissory note. The notes and mortgages, hereinafter referred to as securities, were executed by different persons who had obtained loans from the bank and were, prior to January 12, 1932, the property of said bank and were a part of its assets obtained by it in the regular course of its business. On January 12, 1932, defendant was, and continuously for about ten years prior thereto had been, a director of said bank, and continued as a director thereof until said bank was taken over by the bank commissioner February 1, 1932. In the year 1927 defendant was appointed as administrator of the estates of Edna Louise and John Starley, and still continued in that capacity.

As such administrator he had deposited the moneys belonging to said estates in a savings account in said bank. The amount originally deposited was $5,000, but said account had been drawn upon at various times. The record shows that on January 12, 1932, at a regular meeting of the board of directors of said bank according to the minutes of said meetings, defendant reported to the directors that he had about $2,400 on deposit belonging to said estate, and asked "if it was agreeable with the board for the amount to be invested in a note or notes of the bank." The request met with approval, and a director, the cashier, and defendant selected notes to be given defendant in lieu of said deposit,

being the securities sued for in this action. The securities, however, were not delivered to defendant until January 18, 1932, at which time the amount on deposit was $2,134.70. Upon delivery of the securities the deposit account was canceled. The securities had a total face value of $2,135.50, and the trial court found them to be of the value of $2,135.

This action was brought by the bank commissioner to recover the said securities on the theory that the transfer thereof to defendant was void and no title thereto passed by virtue of the transaction above outlined, as the bank was, at the time, insolvent; that defendant, as a director of said bank, knew, or was in a position to know, of its insolvency, and that, by taking said notes and mortgages, he, as a depositor, obtained a preference and advantage over other creditors and depositors of said bank.

The trial court entered judgment in favor of plaintiff for immediate possession of said securities, and ordered defendant to deliver them to plaintiff. The court further decreed that, in the event recovery of said securities could not be had, plaintiff have judgment against defendant in the sum of $2,135, the value of said securities. The defendant appeals, and contends that the judgment, so entered, is erroneous, for the following reasons: (1) The finding that the bank was insolvent on January 12, 1932, is not sustained by the evidence; (2) the evidence does not support the finding that the said securities were of the value of $2,135; (3) that the transaction was only voidable at most, and could only be rescinded by restoring the status quo; (4) that claim and delivery does not lie, as title and possession passed lawfully to defendant, who as administrator, was under duty to retain said securities at least until the consideration given was restored to the estates; and (5) that the statute pertaining to persons does not apply to one acting as administrator.

In 7 C. J. p. 727, § 482, the rule as to solvency and insolvency is stated as follows:

"A bank is solvent when it has enough assets to pay, within a reasonable time, all of its liabilities through its own agencies, and is

insolvent when unable to meet its liabilities as they become due in the ordinary course of business, or, in shorter terms, when it cannot pay its deposits on demand in accordance with its promise."

This rule is so abundantly sustained by the authorities, and, since both parties concede it to be the rule, we deem it unnecessary to give further citations in support thereof.

The evidence on the question of insolvency may be summarized as follows: Between January 2, 1932, and February 1, 1932, when the bank commissioner took charge the reserve carried by the bank was far below that required by law. Upon a fair appraisal of the bank's assets, it appeared the liabilities exceeded the assets by approximately $183,000, and after applying the capital and surplus, there would be a loss of $61,000, and such loss had been sustained before January 12, 1932, and existed six months prior thereto. The bank owed a noted for $20,000, which came due January 4, 1932, which was unpaid, and owed another note for $49,300, which would fall due in March, 1932, with no prospects of paying the same, both of which notes were for borrowed money. At a meeting of the directors of the bank held January 12, 1932, the cashier reported the required legal reserve was $68,750, whereas the reserve on hand was but $48,000, a deficiency of $20,750. It was also reported that the country treasurer's bondsmen were concerned about the treasurer's account. The cashier was then authorized to borrow up to $200,000 to keep the accounts up and cover public funds. On February 1, 1932, the public funds on deposit aggregated $202,516.05, and the fair inference is that substantially the same amount was on deposit on January 12, 1932. During January there was a marked shrinkage of deposits, until there was only $5,844.10 in cash on hand when the bank commissioner took charge. To be safe, the bank would have to borrow $130,000 in addition to the $70,-000 already borrowed in order to meet the requirements of its depositors. The average monthly withdrawals of the school board and county amounted to approximately $45,000,

a sum in itself greatly exceeding the total legal reserve on hand on any day from January 13, 1932, to the closing of the bank. Notice of withdrawal of savings' accounts was required as of December 1, 1931. There is some evidence by defendant and the cashier that they did not think the bank was insolvent, and, by procuring a loan as authorized in the meeting referred to, they hoped to continue as a going concern. But, as said in *Steele* v. *Randall* (C. C. A.) 19 F. (2d) 40, 41, "Insolvency is a condition unaffected by intentions or hopes of the persons affected. When the bank could not meet its obligations as they became due, it was insolvent." Measured by this rule, the evidence amply merits the finding of the trial court to the effect that the bank was insolvent on January 12, 1932, and this court cannot disturb such finding.

As to the value of the securities delivered to defendant, the evidence shows that the possibilities were that they would all be paid in full. The secured notes, in all instances, carried security, the value of which equaled, or substantially equaled, the obligation involved. Defendant offered no evidence whatever as to the value of these securities. For him to say they were worth substantially less than their face places him in a paradoxical position of justifying a purchase of securities by him with trust funds, knowing those securities to be worth substantially less than the amount paid for them. The fact that he would pay $2,134.70, the amount of the deposit, for them, is evidence that he must have considered them worth that amount, and this in itself would be some evidence of their value. If he did not believe them worth the price paid, it would be but fair to infer that he was either willfully disregarding his duty as administrator or, on the other hand, that he considered the bank's financial condition such that he could justify his trade, notwithstanding the precarious financial condition of the bank. In our opinion, the court's finding as to the value of the securities is so far sustained by the evidence that we do not feel called upon to disturb the same.

The disposition of the defendant's third contention and the several aspects thereof, as heretofore outlined, involves a consideration of the law of this state relative to banking and the public policy forming the fundamental and basic principles of such legislation. From a reading of R. S. Utah 1933, title 7 (7-1-1 et seq.), it is apparent that the Legislature has recognized the quasi public character of the business of banking, and has, accordingly, prescribed a set of rules and regulations, applicable only to that business, for the purpose of safeguarding the interests of the public. By definite statutory provisions no one but a corporation organized for that purpose can conduct a banking business. R. S. Utah 1933, 7-3-5. Its articles of incorporation must be approved by the bank commissioner. R. S. Utah 1933, 7-3-12. By R. S. Utah 1933, 7-2-15, when a bank is taken over for liquidation, no preference or priority shall be given to any claim, with certain specified exceptions. Without referring to the specific statutory provisions, we may observe that a banking corporation is a creature of the specific grants contained in the statutes. It must have a specified minimum capital stock paid in and a specified surplus fund; its stockholders are subject to double liability; its directors must take oath, peculiar to banking institutions, with respect to their duties; it must carry a specified legal reserve in cash or its equivalent. The directors are required to make a monthly examination of the affairs of the bank and to file reports thereof so that the same are available to the examiner, and they must also make a full examination of the bank's affairs at least once a year and file a written report thereof; the bank commissioner has supervision over the banks with the power to make rules and regulations governing their conduct, operation, and management. The financial condition of the bank must be published; any impairment of the capital stock must be made upon notice from the bank commissioner; a limit is placed upon the amount the bank can loan to any one individual. R. S. Utah 1933, 7-3-45, provides:

"No bank or bank officer shall give preference to any depositor or creditor by pledging the assets of the bank as security; provided, that commercial banks may borrow money for temporary purposes and may pledge assets of the bank not exceeding fifty per cent in excess of the amount borrowed as collateral security therefor, and that savings banks may borrow money and pledge or hypothecate their securities as provided in section 7-3-46. * * * Nothing herein contained shall prevent any bank from rediscounting in good faith and indorsing any of its negotiable notes. Any bank borrowing money or rediscounting any of its notes shall at all times show on its books and in its reports the amounts of such borrowed money or rediscounts. No officer of any bank shall issue the note of such bank for money borrowed or rediscount any note, except when authorized by resolution of the board of directors of such bank."

In the conduct of a banking business, other peoples' moneys are solicited and received by the bank to be used and invested by it for the benefit and profit of its stockholders. The confidence and integrity of a bank and its ability to properly safeguard the money thus intrusted to it is a necessary asset to its continued existence. Such confidence only can be sustained by adopting and practicing the policy of equity of treatment between depositors with preferences to none. Any practice which tends to destroy that confidence should not be permitted. It is clear that, by the terms of the statutes above referred to and summarized, the Legislature recognized these principles as being the policy to be pursued in the control and regulation of banks and banking. In *Leyvraz* v. *Johnson,* 114 Fla. 396, 154 So. 159, 164, the court says:

"The general rule that a private debtor may lawfully prefer one creditor over another * * * does not apply in a case where the debtor, a banking institution, is charged with quasi-public duties and obligations and its business is so burdened with a public interest as to require the exercise by the state of its police power to regulate and supervise."

Under the provisions of section 7-3-45, supra, no depositor is to be preferred above another. While said section provides that nothing therein "shall prevent any bank from

rediscounting in good faith and indorsing any of its negotiable notes," the inference is plain that any rediscounting and indorsement of notes not done in ▮ good faith is illegal, as being contrary to the announced policy of the law. The policy of the law is to provide a maximum of protection and equality of treatment to all depositors. It necessarily follows that depositors as such have an interest in the manner in which the bank is conducted, and that a rediscounting in bad faith is a concern of the depositors, and it is not merely a matter between the bank and the party dealing with it in such respect. In other words, whether a rediscounting has been undertaken in good faith depends upon its effect in respect to the depositors as a whole as well as upon its effect as between the bank as such and the purchaser of its securities. R. S. Utah 1933, 7-3-7, gives banking corporations "all the rights, privileges and powers" of private corporations for pecuniary profit "except as in this chapter otherwise provided." Aside from those peculiar powers necessary to the existence of a corporation as such (R. S. Utah 1933, 18-2-16, governing the powers of corporations generally), it confers the power to "buy, receive, use, lease, mortage, sell or otherwise dispose of, personal property." It also authorizes corporations to "buy, receive, use, sell, mortgage, lease or bond, or otherwise dispose of, all such real estate as may be necessary, useful or desirable for it to own, use or dispose of for its purposes." In our opinion, the grant of power thus made, with respect to disposing of property, is limited by the express language of R. S. Utah 1933, 7-3-45, and by the public policy evidenced by the provisions of title 7 heretofore stated. While a corporation may be said to possess such implied powers as are necessary, usual, or incidental to its business, yet such powers can only be such as can be exercised in the proper conduct of the business. It is also true that, the more limited and special the scope of the authorized business is, the narrower will be the range of both its granted and implied powers. It follows that there can be no implied powers to

do any act which is contrary to the statutes or the public policy forming the basic powers of such statutes. In *Farmers' & M. State Bank* v. *Consolidated School Dist.*, 174 Minn. 286, 219 N. W. 163, 165, 65 A. L. R. 1407, it is said that the primary duty of a bank is to protect and maintain unimpaired the right of the depositor to get back his own by equivalent value without preference or priority to others.

"The plainest public policy demands that it shall be so maintained. Therefore, anything which unavoidably and in the usual course of things tends to its impairment is contrary to public policy."

In the present case the evidence discloses that defendant, at the time when he knew, or in the exercise of his duties as a director, as provided by law, should have known, the bank was insolvent, and that it could not continue to do business unless it obtained a large loan, obtained out of the assets of the bank securities of a value equal to the amount on deposit to his account as administrator of the Starley Estates. The evidence shows that the liabilities of the bank exceeded the assets by $183,000, and that a loss of $61,000 would be sustained after applying the capital stock and surplus held by the bank. The inevitable result of the action of the bank in exchanging the securities in question for defendant's deposit account was to give him as administrator an advantage and preference over the other depositors. To allow the defendant to retain the securities thus obtained would give legal sanction to an attempt to save the funds of one depositor at the expense of the others. In our opinion, this would be contrary to public policy and a violation of the provisions of section 7-3-45, supra. In the case of *Luikart* v. *Hunt*, 124 Neb. 642, 247 N. W. 790, 792, a note of the bank was sold to one of its depositors when the bank was insolvent. The court, in voiding the transaction, says:

"The funds of depositors are received by a banking corporation with the knowledge and notice given by this wise principle of the law, not only to the officers of the bank, but to every depositor, that all assets of the bank, which are largely created by these deposits,

will always be a fund subject to pro rata repayment to depositors, whenever the bank ceases to function as a going concern and to pay its depositors in the ordinary course of business. With such a spirit and understanding of the law, may the officers of a bank, knowing its insolvency, realizing that its receivership is imminent, thus prefer certain depositors over all others by the subterfuge of trading the best assets in the bank's note case for deposits, in some instances not yet due? We think not. To decide otherwise would be a manifest travesty upon justice. The mere announcement of such a rule would be at once an invitation to a condonation of recreant and conscience-less bank officers. It would authorize and encourage them to plunder their banks and to carve out and apportion to a chosen few the choicest assets of the corporation, leaving to the other depositors and creditors little more than a myth or shadow to which they may resort for the payment of their claims. We reject the idea, and are of the opinion that the officers of the bank committed a fraud upon the other depositors and violated the law when they took the note and mortgage out of the bank's note case and traded it for Mrs. Hunt's certificates of deposit."

It is contended by defendant that the estates are not charged with knowledge that the bank was insolvent. Plaintiff, on the other hand, contends that the knowledge of the affairs and conditions of the bank which defendant as a director thereof had, or must be held to have had, is imputed to him as administrator of the estates and binds the estates. It is not necessary to pass upon that question, as it is immaterial whether the estates knew of the bank's insolvency. The invalidity of the transfer "does not depend on knowledge of transferee but on fact of insolvency." *Bradley* v. *Guess,* 165 S. C. 161, 163 S. E. 466; *Walther* v. *McFerson,* 92 Colo. 314, 20 P. (2d) 552. The transferee is charged with notice that the transaction was illegal. *Luikart* v. *Hunt,* supra. Nor is it necessary to prove that defendant, as a director of the bank as such, actually intended to give preference. 2 Morse on Banks and Banking (6th Ed.) § 623, pp. 1309, 1310, says:

"A bank is in contemplation of insolvency reasonably when the fact becomes apparent to its officers that it will presently be unable to meet its obligations. When the transfer under consideration was made, such knowledge existed (though the officers might

hope otherwise), and the natural and probable consequence of the transfer was a preference; and since every person is to be presumed to intend the natural and probable consequence of his own acts, there was a legal intent to prefer, and this cannot be rebutted by showing another motive."

Defendant's contention, however, that the law prohibiting preferences does not apply to him as an administrator, and he relies on the case of *Leach* v. *Beazley,* 201 Iowa 337, 207 N. W. 374, in support of such contention. In that case, however, no statute such as we have in this state appears to be involved, nor does it clearly appear in what capacity the defendant Miller was sued. In our opinion, the fact that the depositor happened to be an administrator who as between himself and the estate held the deposited funds in trust cannot furnish any cogent or sufficient reason why the estate, the beneficiary of such deposit, should be preferred over the other depositors. The morals of the situation are not improved by arguing that he could violate his duty to the bank's depositors as a director if his purpose in so doing was only to protect the trust fund placed in his charge as administrator. Such argument involves a weighing of the relative importance of his trust duties as an administrator as against his trust duties as a director, and entirely disregards the rights of the other depositors. The mere fact that the funds deposited had been intrusted to the depositor as trust funds does not create a relation between the bank and a cestui que trust different from that existing between the bank and depositors who deposit their own funds. *Pethybridge* v. *First State Bank,* 75 Mont. 173, 243 P. 569.

In the case of *Julius* v. *State,* 113 Okl. 7, 237 P. 605, the court held that a transfer to a guardian to secure the deposit of such guardian constituted an unlawful preference under the statute substantially like ours. In *Farmers' Sav. Bank* v. *Bergin,* 52 S. D. 1, 216 N. W. 597, the court held an exchange by a guardian of a certificate of deposit for some of the bank's securities was an unlawful preference. No stat-

ute seems to have been involved in this case directly prohibiting such transfer. In both of these cases the bank commissioner was allowed to recover possession of the securities involved.

It is strenuously argued by defendant that a claim and delivery action will not lie in this case and the preference made the transfer of the notes voidable only by way of rescission; that to avoid the transfer it was incumbent upon the plaintiff to restore the consideration given, and no attempt was made to do so; that, until such restoration was made, or offered to be made, defendant is entitled to retain possession of said securities. With this argument we cannot agree. It loses sight of the fact that the effects of such a transfer are not limited in their scope to the bank and the transferee; that the rights of depositors and creditors who have in no wise consented to or entered into the transaction are involved and adversely affected. The bank commissioner, when he takes charge of a bank, represents all depositors and creditors as well as the bank itself. It is his duty to protect and vindicate their rights and to see that the assets of the bank are impounded and properly distributed without favoritism or preferences. He thus acts in a dual capacity. Exchanging assets of the bank for the deposits of the defendant would work a fraud upon the other depositors and creditors, under the circumstances disclosed by the evidence in this case. In representing such depositors and creditors, the bank commissioner is not to be limited to the rights which the bank itself might have asserted. He may assert the fraud against the one who received the preference. To require the restoration of the deposit, before allowing a recovery of the assets illegally transferred, would be giving to the favored depositor, to all practical purposes, the same result as if the transaction were wholly legal. Further, the transfer being in fraud of the other depositors and creditors, and being contrary to public policy and the provisions of section 7-3-45, supra, the same is a nullity and void ad initio. No rights whatever were

created by the transfer of the securities, and the defendant is bound to restore the securities delivered to him. In the case of *Smith* v. *First National Bank,* 59 S. D. 320, 239 N. W. 842, 847, it was contended that plaintiff could not recover the securities illegally pledged without first restoring defendant to its position before the transaction. The court says:

"If the Farmers' Bank was a wrongdoer in pledging its assets, it dealt with its assets to that extent in fraud of its creditors. The creditors did not participate in such wrongdoing, and are not bound thereby. The creditors, under the circumstances of this case, and by virtue of the existence of the statute, have a right upon their own part, separate and independent from any rights of the Farmers' Bank, to have assets of the Farmers' Bank, illegally pledged by it, returned into the estate of the insolvent bank for the benefit of creditors. The superintendent of banks represents that right in this case, and is entitled to recover the asset in question free of appellant's illegal claim against it in his capacity as representative of creditors, even though the Farmers' Bank itself as a going concern might not be so entitled, and even though the superintendent of banks solely as a representative of the Farmers' Bank might not be so entitled. Conceding that appellant may be right in its contention that the Farmers' Bank and the National Bank were in pari delicto as to the illegal transaction between them, nevertheless we are of the opinion that there is sufficient public interest in having the statute forbidding the pledging of bank assets enforced according to its terms to justify and, in fact, require a court, when a bank has become insolvent and is in process of liquidation, and it is discovered that certain of its assets are outstanding upon illegal pledge, to order the return of said assets for the purpose of liquidation, regardless of the claims of the illegal pledgee, and not to permit the statute to be circumvented by allowing such pledgee to retain possession of such assets and enforce his illegal pledge agreement with substantially the same practical effect as if it had been a valid agreement."

To the same effect see the following cases: *Porter* v. *Canyon County Farmers' Mutual Fire Ins. Co.,* 45 Idaho, 522, 263 P. 632; *Tex. & Pac. R. Co.* v. *Pottorff,* 291 U. S. 245, 54 S. Ct. 416, 76 L. Ed. 777; *City of Marion* v. *Sneeden,* 291 U. S. 262, 54 S. Ct. 421, 78 L. Ed. 787; *Smith* v. *Baltimore & O. R. Co.* (D. C.) 48 F. (2d) 861; *Eckerson* v. *Utter* (D. C.) 7 F. Supp. 201; *Julius* v. *State,* supra; *Wood* v. *Imperial Irr.*

*Dist.,* 216 Cal. 748, 17 P. (2d) 128; *Smith* v. *Keener,* 51 S. D. 124, 212 N. W. 498; *Woonsocket State Bank* v. *Parsons,* 52 S. D. 534, 219 N. W. 121; *Divide County* v. *Baird,* 55 N. D. 45, 212 N. W. 236, 51 A. L. R. 296; *Farmers' & Merchants' State Bank* v. *Consol. School Dist.,* 174 Minn. 286, 219 N. W. 163, 65 A. L. R. 1407; *Bank of Springfield* v. *Williams,* 43 S. D. 529, 205 N. W. 221; *Baird* v. *Reinertson,* 64 N. D. —, 253 N. W. 159.

The rights of the defendant as administrator and the rights of the estates which he represents, with respect to the moneys on deposit in the bank and to the disposition of such deposit to be made in the liquidation of the bank, are not before us in this case, so no opinion is expressed thereon.

Plaintiff is entitled to the possession of the securities held by defendant, and which are sought to be repossessed in this action. The judgment of the lower court is affirmed; costs to respondent.

STRAUP, C. J., and ELIAS HANSEN, FOLLAND, and MOFFAT, JJ., concur.