Wasson v. Wooten.

4-3583

Opinion delivered July 23, 1934.

W. H. Donham, Moore, Gray, Burrow & Chowning and Trieber & Lasley, for appellant.

Fred A. Isgrig and House, Moses & Holmes, for appellee.

T. J. GAUGHAN, Special Chief Justice. On February 28, 1933, the Bankers' Trust Company, People's Trust Company and Union Trust Company, all of Little Rock, Arkansas, being unable to meet the current lawful demands of their respective depositors, continued business under what is termed a restricted deposit basis. On May 1, 1933, the State Bank Commissioner took charge of each of said banks, and soon thereafter issued charters for three new banks.

A part of the assets of each of the banks was pledged to the Reconstruction Finance Corporation to secure a loan for amounts sufficient to pay the respective depositors fifty per cent. of their deposits. Certain other assets, including the cash from the loan, were transferred to the respective new banks, and shares of stock in the new banks were issued to the old banks. The shares of stock were pledged to the Reconstruction Finance Corporation, with the other assets referred to, but later the stock

was released and became assets of the old banks in the hands of the Bank Commissioner. The new banks, under their agreement with the Commissioner, paid to all of the depositors of the three old banks fifty cents on the dollar of their deposit claims.

The principle involved in the determination of this case applies equally to each of the three banks. We shall therefore refer to the proceedings of one and the discussion will be equally applicable to the others.

When the common stock of the new Bankers' Trust Company was released by the Reconstruction Finance Corporation to the Bank Commissioner, he offered it to the depositors of the old Bankers' Trust Company in exchange for a certain percentage of their deposit claims. Each depositor was requested to accept a like proportionate part. According to the brief filed by plaintiff, a majority of the depositors declined to exchange any part of their deposits for stock, while a number of others accepted stock in exchange for a part of their deposits.

The question now presented by the complaint is whether, in making distribution in the future, in order to prevent a preference, the Bank Commissioner should be required to distribute to the depositors, who did not accept stock, a sum equal to the amount of the exchange value of the stock accepted by the other depositors.

In order to simplify the problem, let us suppose that A and B were depositors in the Bankers' Trust Company, each in the sum of $1,000. They were paid fifty per cent. of their deposits, so that A and B afterwards held deposit claims each in the sum of $500. Both were requested to exchange a certain per cent. of their claim for a certain number of shares of stock in the new bank. A declined to make the exchange. B accepted the stock, and his deposit is, as a result, reduced to $350. A small distribution has, by the Bank Commissioner, been made to the depositors. In the case of A, his percentage is based on a $500 claim and in the case of B, on a $350 claim. The plaintiff is contending that no distribution should have been made to B until after the distributions to A should amount to $150, and that, until this is done, to allow a dividend or distribution to B on the remainder of his

claim of $350 is a preference. Obviously this position assumes that the exchange of stock for deposits, made between B and the Bank Commissioner was not an exchange or sale, but was in fact a dividend or distribution. A is not asking that the trade between the Commissioner and B be set aside or rescinded, but that the exchange price of the stock be treated as if it were an advancement in legal tender currency.

The stipulation pertinent to the issue is as follows:

"5. Simultaneously with taking charge as aforesaid, the Bank Commissioner joined with each of the respective old banks in the procurement of loans from the Reconstruction Finance Corporation upon the security of certain of the assets of each of the said respective old banks, and in transferring to the respective new banks, which were organized at that time in succession to the said respective old banks pursuant to act 88 of the Acts of the year 1933, effective March 9, 1933, and to the rules and regulations duly made and approved thereunder, substantially all of the assets of the old banks, at their appraised value, other than those assets pledged as security for the said loans. Included with the assets so transferred to the respective new banks were the proceeds of the respective loans. The said new banks were organized with shares of capital stock having an aggregate par value, in the instance of the one succeeding the said People's Trust Company of $200,000, in the instance of the one succeeding the said Bankers' Trust Company, of $300,000, and in the instance of the one succeeding the said Union Trust Company of $300,000. Each share of the stock of the said new banks had a book value on May 1, 1933, in the instance of the one succeeding the said People's Trust Company of $31.25, in the instance of the one succeeding the said Bankers' Trust Company, of $28, and in the instance of the one succeeding the said Union Trust Company of $28.75. Of the stock of the new banks, there was issued to the said respective old banks, or the Bank Commissioner in charge thereof, in part consideration for the assets transferred to the respective new banks, in the case of the People's Trust Company, 5,086 shares on the basis of book value, but having a par

value of $25 per share; in the case of the said Bankers' Trust Company 14,650 shares, on the basis of the book value, but having a par value of $20 per share; and in the case of said Union Trust Company 14,107½ shares, on the basis of book value, but having a par value of $20 per share. The said amounts of stock so issued to the said respective old banks were included among the assets thereof which were pledged as security for the said respective loans of the Reconstruction Finance Corporation, and were all of the stock which is or can be involved in the within suit; all the remainder of the capital stock of the said respective new banks having at all times belonged to individuals who, at the issuance thereof, subscribed and paid cash therefor at the said respective book values per share. Each of the said old banks guaranteed its respective successor new bank, to the extent of the book value of the number of shares of stock in the new bank issued to the old bank, against loss within three years of any assets transferred to the new bank. * * *

"7. Immediately upon taking charge of the said respective old banks, the Bank Commissioner, on said May 1, 1933, duly levied assessments against the stockholders of each of the said old banks, for the purpose of paying its respective debts, in amounts of 100 per cent. of the par value of the stock holdings of its respective stockholders, aggregating $350,000 in the instance of said People's Trust Company, of which $21,800 has been collected to this date, aggregating $600,000 in the instance of said Bankers' Trust Company, of which $8,400 has been collected to this date, and aggregating $500,000 in the instance of the Union Trust Company, of which $161,-225.92 has been collected to this date.

"8. Sometime prior to February 1, 1934, the said Reconstruction Finance Corporation released to the said Bank Commissioner all of the shares of stock in the respective new banks which had theretofore been pledged on behalf of the respective old banks as aforesaid, and thereupon the said Bank Commissioner, in charge of the respective said old banks, in pursuance of said act No. 88 and of the rules and regulations duly made and approved thereunder, offered to each and all of the de-

positors of the respective old banks an opportunity to acquire their proportionate parts of the stock so released through purchase thereof by them respectively, and their payment therefor out of their respective remaining deposits in said old banks, and all of the said stock so released to the said respective old banks was disposed of at said time to such of the said depositors as respectively were willing to acquire the same in the manner aforesaid. The respective depositors who elected to acquire said stock paid therefor out of their said remaining deposits for each share of stock the sum of $31.25 in the instance of stock in the new bank succeeding the said People's Trust Company, $28 in the instance of stock in the new bank succeeding the said Bankers' Trust Company, and $28.75 in the instance of stock in the new bank succeeding the said Union Trust Company, said amounts being in each respective instance the then book value. Country banks organized and existing under the laws of the State of Arkansas were depositors of each of the said old banks, and they respectively acquired and paid for considerable aggregates of the said stock in the manner, and at the respective prices aforesaid; but each of the said country banks was forthwith required by the Bank Commissioner to include the said stock among its respective assets at not more than par, and to agree to dispose of the same within not more than one year. No market for the said shares existed at the time when the Bank Commissioner offered the same to the respective depositors of the said old banks, inasmuch as the public generally were then fearful of acquiring bank stock. At the time of this stipulation, there have been very few sales of the shares of stock of the new banks, and the market value, if any, thereof is uncertain. Since the said sales of stock to depositors of said old banks each of the said new banks has nationalized. * * *

"12. The offer of the Bank Commissioner to dispose of stock in the respective new banks to the depositors of the respective old banks, hereinabove referred to, was in each instance made on the same terms to all depositors of the said respective old banks propor-

tionately, and without partiality or preference to any of them, and the sales of said stock were consummated only by separate arrangements with such of the depositors as respectively consented to acquire the same in the method and at the purchase price aforesaid. At the time of the said respective stock sales there was no way of foretelling with definiteness, nor is there now, the amounts which will ultimately be realized from the assets and assessments against the stockholders of the respective old banks, but the Bank Commissioner and the respective old banks were hopeful, at the time of said respective stock sales on the basis of appraisals, that each of said old banks had sufficient assets through orderly liquidation thereof, and the collection of stock assessments to pay all of its respective depositors in full. In disposing of said stock in the manner aforesaid, the Bank Commissioner and each of said old banks acted in good faith, and in the belief that the same was to the best interest of all the depositors of each of said old banks. Since disposing of said stock in the manner aforesaid, the Bank Commissioner has required all State banks having deposits in any of the respective said old banks to charge off the same as having no value as assets."

"14. The plaintiff was a depositor of each of said old banks at the close of business on said February 27, 1933, and is now, and has not acquired stock from either of said old banks, and he is not chargeable with laches in the bringing of this suit."

"The facts set forth in the stipulation were all of the facts before the court in the said cause."

The court below directed that future distributions of dividends be paid to such depositors, as had not heretofore purchased stock of the Bank Commissioner to the exclusion of depositors who purchased stock, until each depositor not purchasing stock was brought to a parity with depositors who had purchased stock.

The plaintiff contends that, notwithstanding paragraph No. 12 of the stipulation, if it appears from the stipulation as a whole that there was, in fact, a preference created by the sale of stock in exchange for de-

deposits, the court should remove the inequality in the manner prayed for in the complaint.

The general doctrine is well settled that preference in distributing trust property is forbidden. Yet our statute authorizes the Bank Commissioner, in liquidating banks, under supervision of the chancery court, to compound debts, sell assets in piecemeal, and exchange property for deposits. It must have been known by the lawmakers that inequalities would result. The Commissioner may act in perfect good faith, and for what he conceives to be the best interest to all concerned, and yet he may sell a doubtful note in exchange for a deposit, and the buyer may, contrary to his own expectations, collect the note in full. On the other hand, the buyer of the note may fail to collect any sum whatever. In each instance a preference resulted. In one instance, against the seller, and in the other, against the buyer. It is not this character of preference that is condemned. In determining whether depositors suffer injury or discrimination on account of sale of assets or exchange for all or part of deposit liability, we must consider the transaction as of the time the sale or exchange occurred.

Now, applying this rule to the present case, do the facts justify us in holding that the sale complained of was a preference as between the depositors who retained their deposits, and those who exchanged a part for stock?

After carefully studying the stipulation and taking cognizance of the well-known financial conditions of our country at the time, we have reached the conclusion that at the time the exchange was made, neither the stock nor the deposit liability had a market value, nor could the Bank Commissioner or anyone else foretell, with any reasonable certainty, the future return from either.

Plaintiff presents two reasons for his contention that the stock, at the time of the sale, was of more value than the deposits canceled in exchange. The two reasons relied on are: First, the guarantee of the old bank, set out in paragraph No. 5 of the stipulation; and, second, because, since the sale of the stock, the Bank Commissioner has permitted country banks to retain the stock obtained by them among their assets, as set out in

stipulation No. 8, and also has required them to charge off any deposit claim held against any of said banks. See stipulation No. 12.

The difficulty in enforcing, in a practical way, the guarantee referred to renders it doubtful whether the guarantee added substantial value to the stock of the new banks.

No explanation of the action of the Bank Commissioner in respect to the so-called country banks is offered, and we are left to conjecture as to what reasons prompted him to this action. The fact is presented in evidence, no doubt as a circumstance to establish the claim of preference. Unexplained and without proof that the action of the Commissioner truly reflected the respective fair market value of the stock and the deposit liability at the time of the exchange, we think the circumstance can have but little, if any, probative force.

It is observed that the country banks must dispose of the stock within one year, and that up to this time, but little has been sold. What loss the country banks will sustain in disposing of the stock within the year named, and what sums those who retained their deposits may ultimately receive, we cannot, under the stipulation of fact, know with sufficient certainty to enable us to disapprove the action of the Commissioner, admittedly made in good faith, and in what he conceived to be to the best interest of all depositors alike.

We have also carefully considered the question of fact as to whether the transfer of the stock in the new banks to the depositors of the old banks in exchange for their deposit claims, or a part thereof, amounted to a separate sale to each of the depositors or to a dividend or distribution; and have reached the conclusion that each such transaction was in fact a separate sale.

Since the facts do not establish that a preference, within the legal meaning of this term, was given by the Commissioner in the exchange of stock for deposits, and since each such transaction was in fact a sale, it only remains for us to determine whether or not the Commissioner was clothed with authority to sell the stock for deposits. We think the authority, subject to the super-

vision of the chancery court, is fully sustained in the following recent decisions of our court: *Dunkin* v. *Taylor,* 185 Ark. 1033, 50 S. W. (2d) 978; *Lummus Cotton Gin Co.* v. *Taylor,* 188 Ark. 100, 64 S. W. (2d) 90.

Under the facts presented, we think the acts of the Commissioner should be approved. The decree appealed from is reversed, and the cause remanded with directions to approve the acts of the Commissioner in disposing of the stock of the new banks, and in distributing the funds of the old banks. It is so ordered.

MEHAFFY, J., (dissenting). I do not agree with the majority that the facts in this case do not establish a preference. The majority opinion correctly states the issue as follows: "The question now presented by the complaint is whether, in making distribution in the future, in order to prevent a preference, the Bank Commissioner should be required to distribute to the depositors who did not accept stock a sum equal to the amount of the exchange value of the stock accepted by the other depositors."

The majority opinion states: "The general doctrine is well settled that preference in distributing trust property is forbidden."

Therefore the majority holds that, if there was a preference, it would be unlawful. The question then is: Was there a preference?

The majority opinion supposes that A and B were depositors in the Bankers' Trust Company each in the sum of $1,000. They were paid 50 per cent. of their deposits so that A and B afterwards held deposit claims each in the sum of $500. Both were requested to exchange a certain per cent. of their claims for a certain number of shares of stock in the new bank. A declined to purchase stock in the new bank. B purchased stock to the amount of $150, and was paid $150 of his $500 deposit. Neither of them were required to purchase the stock, but the stock was offered to stockholders and others at a fixed price.

I think it makes no difference whether they paid B $150 of his deposit in money or permitted him to use it

in the purchase of stock of the value of $150. In either event, he received $150 of his deposit, and A received nothing.

But suppose that B was a depositor in the sum of $5,000 and A in the sum of $500. When the 50 per cent. dividend was paid, B's deposit would be reduced to $2,500 and A's to $250. Then, if B purchases $1,250 worth of stock in the new bank and A does not purchase any stock, B's deposit then would be $1,250 and A's would be $250. The plaintiffs contend that, since B has received $1,250 of his deposit in stock, he is not entitled to any further dividend until A receives the same per cent. that B has received. It is true that A is not asking that the trade between the Commissioner and B be rescinded, but he is asking that he receive the same per cent. of his deposit that B received. How it can be contended that when A has received 50 per cent. in dividends and B has received 75 per cent. of his deposit in dividends, that this is not a preference or discrimination, I am unable to understand. According to the opinion of the majority, it is conclusively presumed that B received $1,250 in value on his deposit and that A received nothing. But it is said that this is not the character of preference that the law condemns.

It is true that the law authorizes the Bank Commissioner under the supervision of the chancery court to compound debts, sell assets in piecemeal, and exchange property for deposits. I think a complete answer to this is that the trade in the instant case was not made under the supervision of the chancery court. No order was made by the chancery court authorizing the sale, and the chancery court refused to approve it.

This court has never held that these things could be done except under the supervision of the chancery court. The majority opinion cites two cases only: *Dunkin* v. *Taylor,* 185 Ark. 1033, 50 S. W. (2d) 978, and *Lummus Cotton Gin Company* v. *Taylor,* 188 Ark. 100, 64 S. W. (2d) 90.

In the Dunkin case it was held that the order of the chancery court did not go any further than the statute, and that the parties were endeavoring to carry out the

letter and spirit of the order of the chancery court. The chancery court had made an order authorizing the Bank Commissioner to do just what he did in that case.

In the Lummus Cotton Gin case the court said: "The only difference between the two cases is that in the Dunkin case an order was obtained from the chancery court to compound or settle the claims before the Commissioner compounded or settled them. In the instant case, the chancery court confirmed the settlement of the claims after they were adjusted with the depositors by the Bank Commissioner. The confirmation in the instant case of the several settlements had the same effect as if the settlement had been ordered originally by the chancery court."

The court therefore impliedly held in that case that the settlement would have been void without the order of the chancery court. I think the decisions in both cases would justify the affirmance of the instant case.

As I have already said, there was no order of the chancery court either authorizing the settlements or confirming them. Moreover, the question that we have here was not involved in either of the above cases.

It is not contended here that the sale of the stock or the trade of deposits for stock was a preference, but the contention is that, after B has received stock for a part of his deposit, it would give him a preference to pay him any further dividends until A had received the same per cent. of his deposit that had been paid to B.

Of course it is not contended that A could be required to purchase stock. I think we may assume that A's deposit was all the money he had to provide food for his family, and that he could not afford to go into the banking business, even if he had desired to do so. But it is immaterial whether he was unable or unwilling to go into the banking business. The payment to B of any dividend after he had received the stock was wrongful until A had received the same per cent. in payment of his deposit that B had received, and any such payment constituted a preference.

It seems to me that the decision of the majority is an application of the rule announced in Matthew 25:29:

"For unto every one that hath shall be given, and he shall have abundance; but from him that hath not shall be taken away even that which he hath."

"The general rule that a private debtor may lawfully prefer one creditor over another, as expressed in the case of *Jackson* v. *Citizens' Bank & Trust Co.*, 55 Fla. 265, 44 So. 516, does not apply in a case where the debtor, a banking institution, is charged with quasi-public duties and obligations and its business is so burdened with a public interest as to require the exercise by the State of its police power to regulate and supervise." *Leyvraz* v. *Johnson*, 154 So. 159; *Baird* v. *First Nat. Bank*, 55 N. D. 856, 215 N. W. 810, 56 A. L. R. 200; *Baird* v. *Reinerston*, 253 N. W. 159.

"With such a spirit and understanding of the law, may the officers of a bank, knowing its insolvency, realizing that its receivership is imminent, thus prefer certain depositors over all others by the subterfuge of trading the best assets in the bank's note case for deposits, in some instances not yet due? We think not. To decide otherwise could be a manifest travesty upon justice." *Luikart* v. *Hunt*, 124 Neb. 642, 247 N. W. 790; *Divide County* v. *Baird*, 55 N. D. 45, 212 N. W. 236.

"A preference, however, is the paying or securing to be paid in all or in part of one claim to the exclusion of other claims." *Preference-Security Savings & Trust Company* v. *Portland Flour Mills Co.*, 124 Or. 276, 261 P. 432-454.

I think that payment to B until A has an equal per cent. paid on his deposit is clearly a preference, and that the decree of the chancellor is correct and should be affirmed.