## The Venango National Bank *versus* Taylor.

1. Taylor owed a national bank $35,000. Rynd had in the bank a deposit of $44,000. The bank being insolvent, stopped payment. The next day Rynd assigned his deposit to Taylor. *Held*, that Taylor could not set off the deposit against his indebtedness to the bank, as it would give a preference to one creditor of the bank after the act of insolvency.

2. The 50th and 52d sections of the Act of Congress of June 3d 1864 (Banking Act), apply to legal as well as to *voluntary* transfers by the bank.

3. The law will not compel a payment or transfer which it prohibits a debtor from making.

4. Miller *v.* Black, 1 Barr 420, examined and commented on.

October 21st and 23d 1867. Before THOMPSON, STRONG, READ and AGNEW, JJ. WOODWARD, C. J., absent.

Error to the Court of Common Pleas of *Venango county*, No. 190, to October and November Term 1866. In this case The Venango National Bank was plaintiff and C. E. Taylor, defendant.

The following facts appeared in a case stated, agreed upon by the parties :—

On the 14th of April 1865 Taylor gave to the bank his bond for $65,000, with warrant of attorney to confess judgment, and at the same time deposited with the bank $31,000 of United States bonds as collateral security for the bond. The bank sold the bonds in June 1865, with the understanding that their proceeds were to be credited on Taylor's bond. These proceeds, with interest, amounted to $32,000, but the credit was not given.

One John Rynd had to his credit on deposit in the bank, on the 27th of March 1866, $43,743.25. On that day the bank closed its doors and suspended payment, being then and ever since insolvent ; and on the same day suit was brought by Rynd to the use of Taylor to recover his deposit. The writ was served the same day. On the 28th of March Rynd assigned his deposit to Taylor, and afterwards, on the same day, the bank entered judgment against Taylor on his above-mentioned bond.

On the 23d of April judgment was entered for the plaintiff in the suit Rynd to the use of Taylor against the bank, for want of an affidavit of defence : the judgment, on the 12th of May, was liquidated at $44,071.23.

On the 1st of May the judgment of the bank against Taylor was opened, and Taylor let into a defence on the above-stated

facts.   On the 8th of May a receiver was appointed, who has the bank in charge.

"On these facts the defendant claims a credit, first, of the $32,000, and next by way of set-off of so much of the Rynd judgment as will satisfy the residue of the bank judgment, and if the court is of the opinion that he is entitled to it, judgment to be entered in his favor ; or if he is entitled to a credit for the $32,000, but not to a set-off of the Rynd judgment, then judgment to be entered for the bank for $35,024 ; and if he is not entitled to a credit of either, judgment to be entered for the plaintiff for $65,000, with interest from April 14th 1865."

The court (Gordon, A. J.) entered judgment generally for the defendant, and this is the error assigned in the Supreme Court.

*D. Derrickson*, for plaintiff in error, cited Act of Congress, June 3d 1864, §§ 50–52, 2 Brightly's Dig. p. 63.

*Taylor & Mackey* and *A. H. M. Miller*, for defendant in error, cited Jacoby v. Guier, 6 S. & R. 448 ; Filbert v. Hawk, 8 Watts 443 ; Miller v. Black, 1 Barr 420.

The opinion of the court was delivered, October 28th 1867, by
STRONG, J.—The only question in this case is, whether the defendant is entitled to use, as a defence to his bond, the deposit assigned to him by John Rynd.   The bank became insolvent on the 27th day of March 1866.   On that day it closed its doors and suspended payment, and on the 8th of May next following a receiver was appointed by the comptroller of the currency in accordance with the provisions of the Act of Congress of June 3d 1864.   The receiver still has the assets of the bank in charge. On the 28th of March 1866 Rynd had to his credit for deposits made in the bank the sum of $43,743.25, and on that day he assigned the deposit to Taylor, the defendant.   It is this deposit, thus assigned, for which judgment was subsequently recovered, that the defendant claims a right to set off against a claim of the bank against him on his bond for $65,000, given April 14th 1865.

It is plain that if he can use his equitable title to the deposit made by Rynd as a defence against the legal claim of the bank, a preference of one creditor of the bank over others is wrought out and secured after the act of insolvency.

But this is the very thing which, in our opinion, the Act of Congress aimed to prevent.   The bank is a creature of the act, dependent upon it for all its powers, and controlled by all the restrictions which the act imposes.   And creditors dealing with the bank can obtain only such rights as it is authorized to give.

In seeking for the meaning of the Act of Congress we are to

[Venango National Bank *v.* Taylor.]

note its spirit as well as its letter, and its general intent is not difficult to discover.

It provides a system for closing the affairs of an insolvent bank, the clear design of which is to place all creditors, except the government and note-holders, on an equal footing. Its purpose is to disallow preference of one creditor over another, and it denies the power to make such preference at any time after an act of insolvency. The 50th section provides that after such an act a receiver may be appointed who shall take possession of the assets of every description, collect all debts, sell all real and personal property, and pay over all money so made into the treasury of the United States, subject to the order of the comptroller of the currency.

The section then provides for a rateable division of the money among the creditors after paying the government for the redemption of the circulating notes outstanding. The 52d section enacts "that all transfers of the notes, bonds, bills of exchange and other evidences of debt owing to any association" (bank) " or of deposits to its credit; all assignments of mortgages, securities on real estate, or of judgments or decrees in its favor; all deposits of money, bullion or other valuable things for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, with a view to prevent the application of its assets in the manner prescribed by this act (that is, rateably), or with the view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void."

This section is too plain to be misunderstood; read in connection with the 50th it admits of no doubt that the purpose of Congress was to secure all the assets of the bank existing at the time of its act of insolvency for rateable distribution.

We cannot assent to the argument that it was intended for no more than to avoid all acts of the bank itself, all *voluntary* transfers by it of its notes, bonds, deposits, &c., with a view to giving preferences. Its language is general, as applicable to legal as to voluntary transfers.

But if the deposit made by John Rynd can be set off against the bond-debt due by Taylor to the bank, what is it but a transfer of the bond-debt to the satisfaction of a creditor, thus giving him a preference? It is not contended that the bank was not prohibited from doing this, but it is insisted the transfer may be accomplished by an adversary proceeding at the suit of Rynd for the use of Taylor. It is not denied that Rynd, had he made no assignment of his claim, could not have obtained payment of the debt due him by calling upon the bank after the 27th day of March 1866, when its doors were closed, and when it suspended

payments. The bank, it is conceded, was not at liberty to transfer to him either their claim against Taylor or any of their assets, or to pay him any money : and if so, can the thing be secured by a hostile proceeding ? Will the law compel a payment or a transfer which the law prohibits a debtor from making ? A bank after an act of insolvency has no more right to pay a judgment or an execution than it has to pay a debt before it has passed into judgment. But if Rynd could in no way have obtained payment of the deposit due him after the 27th day of March 1866, except through the comptroller of the currency, how could he give to Taylor, by his assignment of the deposit, any right which he did not himself possess ? In this case the assignment was only an equitable one. It did not pass the legal ownership. Taylor had but an equity, and strictly must have gone into equity to obtain any benefit from the transfer. Yet had a chancellor been called upon to enforce the equity, it is plain he would not have enforced it at the expense of other creditors who had a right to a rateable proportion of the assets of the insolvent banking association. Much less would he have compelled the bank to do what the Act of Congress had denied it power to do. It may be conceded, as was insisted in the argument, that there is nothing in the Act of Congress which declares that the assets of a bank vest in the receiver immediately from and after an act of insolvency, or that the appointment of the receiver relates back to such act. Indeed at no time does the property in those assets vest in the receiver. The difficulty of the defendant does not lie here, but it is found in the prohibition of any transfer or disposition of the assets until after a receiver has been appointed, coupled with the manifest purpose for which the prohibition was made. The bank's property is placed by the act under the immediate potential control of the government. It is noticeable that the first object sought to be secured was the payment of the circulating notes. The money obtained by the receiver, after being paid into the treasury, is to be applied first to satisfying the government for the redemption of such notes, and next to payment of creditors of the bank, among whom of course are included depositors rateably. But this primary object would be defeated if depositors can transfer their deposits to the debtors of the bank, and enable them by set-off to relinquish the debts. By such a process the depositors would secure payment of their claims in preference to the note-holders or the government, and rateable distribution among other creditors than the note-holders be frustrated. It need hardly be said that no construction can be given to the Act of Congress so directly at war with its spirit.

The defendant has called our attention to Miller v. Black, 1 Barr 420. There an attachment execution had been laid upon

6 P. F. Smith—2

[Venango National Bank *v.* Taylor.]

a debtor's property after he had made a voluntary application for the benefit of the Bankrupt Act of 1842, but before he was declared a bankrupt; and it was held that the lien of the attachment was preserved by the act, and that it was good against the assignee in bankruptcy.

The case has but a slight resemblance to the present. It is true, the act contained a provision that "all payments, securities, conveyances or transfers of property, or agreements made or given subsequently to the time when the act was to come into operation, *by any bankrupt* in contemplation of bankruptcy, and for the purpose of giving any creditor, endorser or surety, or other person, any preference or priority over the general creditors of such bankrupt should be deemed utterly void and a fraud upon the act." This was aimed expressly against fraudulent acts of the bankrupt alone. And the act also contained a provision preserving liens on real and personal property valid by the laws of the state, and not inconsistent with the provisions of its 2d and 5th sections. Moreover, it enacted that the property of the bankrupt should be divested, and become vested in the assignee from the time of the decree in bankruptcy. The assignee was clothed with such rights as might have been exercised by the bankrupt "at the time of his bankruptcy declared." The ruling of the court appears to have rested upon the clause which preserved liens on the debtors' property. Besides, it was a case of a voluntary petition. The petitioner might have withdrawn his application at any time before the decree, and the fact that he could have discontinued his proceeding was given as another reason why an execution against his property should be held valid.

It is by no means certain that had he been proceeded against by a creditor with a view to having him declared a bankrupt, the same ruling would have been made. However this may be, the provisions of the Bankrupt Act were so unlike those of the Banking Act that the decision of Miller *v.* Black gives us no assistance in the construction of the latter.

We hold, then, that there was error in allowing the deposit made by Rynd to be used as a set-off against the claim of the Bank *v.* Taylor. The defendant was entitled to a credit for the $32,000, realized from the sale of the United States bonds, for there had been an understanding that the proceeds of such sale should be applied on the debt due by him, but he was entitled to no other credit.

> The judgment is reversed, and judgment is entered for the plaintiff for the sum of $35,024, according to the case stated.