RICHARD T. MILLER, receiver,

*v.*

WILLIAM G. AUDENRIED, JR.

RICHARD T. MILLER, receiver,

*v.*

EASTERN MILLING AND EXPORT COMPANY.

RICHARD T. MILLER, receiver,

*v.*

NEW JERSEY TRUST AND SAFE DEPOSIT COMPANY.

[Filed June 3d, 1904.]

1. In a suit by the receiver of an insolvent corporation to recover payments alleged to have been made by the officers of the corporation after its insolvency and suspension of business, evidence *held* to show that when the payments were made the corporation was insolvent and had suspended its ordinary business.

2. Corporation act, section 64 (*Gen. Stat. p. 919*), enacts that on the final dissolution of any corporation all its estate shall vest in the stockholders in their respective proportions.—*Held,* that the suspension of business by a corporation, owing to the destruction of its plant by fire, did not bring the corporation within section 64.

3. Where, in a suit by the receiver of an insolvent corporation to recover a payment made by the officers on a note after insolvency and cessation of the corporation's business, it appeared that the corporation had actually ceased to do business, and that the notes were paid after protest, a contention that they were paid in the ordinary course of business was without merit.

4. Notes given by a corporation were endorsed by its president, and the payee discounted them at a bank. Thereafter, and when the corporation was insolvent and had ceased to do business, it paid the notes, by reason of which payment no notices of protest were given. Subsequently the receiver of the corporation sued to recover the payment, the president being a party to the bill, and a decree prayed fixing his liability.—*Held,* that though the moneys had been paid to the bank the payee of the notes should repay the amount to the receiver, since the bank had lost its remedy on the president's endorsement; but the payee had not lost its remedy on the officer's endorsement, inasmuch as under the circumstances he would not be permitted to set up his discharge.

5. Where, at the time of the insolvency of a corporation, it had no claim against a bank, which held a note of the corporation not yet due, and the corporation, after such insolvency and the cessation of business, and before the maturity of the note, gave the bank a demand note, which the bank immediately charged up to a deposit of moneys made by the corporation that day, the bank was liable for the amount of the note to the receiver of the corporation.

---

These suits are brought by the receiver of an insolvent corporation to recover of the respective defendants certain payments, alleged to have been made to them by the officers of the company after the company became insolvent and had suspended its ordinary business for want of funds to carry on the same as well as in contemplation of the insolvency.

The first two suits were tried together, and the third was tried separately, but the main facts are so identical in all three that they will be considered together.

*Mr. Lewis Starr,* for the complainant.

*Mr. Norman Grey,* for the defendants Audenried and Eastern Milling and Export Company.

*Mr. John T. Harned* and *Mr. Howard Carrow,* for the New Jersey Trust and Safe Deposit Company.

REED, V. C.

The insolvent corporation, of which the complainant is receiver, is the Haas Baking Company. This company was incorporated on May 23d, 1900, with a capital of $50,000, of which about $15,000 was paid for in cash and stock for the remainder was issued for good will of a former business. The company engaged in the baking and sale of bread, its plant being located in Camden. On the night of April 7th, or the morning of April 8th, 1902, its plant was destroyed by fire. The officers of the company endeavored to continue the business at Twenty-fourth and Hamilton streets, Philadelphia, and did so until April 19th, when they entirely abandoned the ordinary business of the company.

On May 6th following a bill was filed by Fleischmann & Company, one of its creditors, to have the Haas Baking Company declared insolvent and a receiver for it appointed. Under that bill the present complainant became the receiver.

Up to the time of the fire the company had a line of credit from its customers and its banking house, and had paid the renewal of its credits as they matured. After the fire, the president, Mr. Warr, says that the company intended to rebuild its plant and continue its business. As already observed, it did continue its business until April 19th. At that time the debts of the company were over $21,000, one of which was its own discounted note for $2,500, held by the New Jersey Trust and Safe Deposit Company; another, $1,000, was evidenced by two notes of $500 each, made to Audenried, and still another, of $2,804, was due to the Eastern Milling and Export Company. The property of the company consisted of a claim against certain insurance companies for unpaid insurance money, and in the horses, wagons, book accounts and the remnants of the plant left by the fire. The amount insured was $12,400, which amount was adjusted at the sum of $10,578. From the rest of the property the receiver seems to have collected $2,287.60.

So that after the fire the company had from $12,000 to $14,000 of assets to pay over $21,000 of debts.

The conduct of the officers of the company after the cessation of business on April 19th may be generally stated as follows: The first installment of the insurance money was paid on April 24th and deposited in the company's bank, the New Jersey Trust and Safe Deposit Company, on that date. The company's balance in bank the previous day was $17.02, and had been from April 18th to April 22d, $8.70. The amount of deposited insurance money on April 24th was $1,411.95. On that day a check was drawn by the company, through its president and treasurer, to John O. Wilson, the treasurer and a director of the company, for $1,400 in his favor.

On the 26th of April there was received from the insurance companies and deposited $3,047.85. Out of this was paid a note of $500, which had been made to the Eastern Milling and Export Company. Upon it were drawn two checks in favor of Mr. Wilson, amounting to $2,075.

On the 28th of April there was received from the insurance companies and deposited $3,047.85. On the same day there was paid to Mr. Warr, president of the company, $500, and to Mr. Wilson, the treasurer, $475; in addition there was paid a note held by the New Jersey Trust and Safe Deposit Company of $2,509.17 and some other small checks. The balance left at the close of each of these days seem to have been as follows: On the 24th, $28.97; on the 26th, $514.57; and on the 28th, $34.26.

On April 30th there was received and deposited of the insurance moneys $817.95, and a check was drawn on this account for $817.65 in favor of Mr. Wilson. This left a balance of 73 cents at the close of that day, and this condition remained until May 5th. Therefore, of the insurance money received, $4,767.61 had been drawn by Mr. Wilson for himself, $500 for Mr. Warr, $2,509.17 had been paid to the New Jersey Trust and Safe Deposit Company and $500 for the payment of notes due to the Eastern Milling and Export Company.

Of the money drawn by Mr. Wilson from the insurance moneys

deposited, he deposited to an account called "The John O. Wilson Special Account," opened with the New Jersey Trust and Safe Deposit Company on April 28th, the following amounts: April 28th, $475; April 30th, $817.95; May 5th, $246.20; total, $1,539.15.

The remainder of the $4,767.61, drawn by Mr. Wilson, seems to have been deposited to his individual account.

The payment of the Audenried claim, now sought to be recovered, was made as follows: Two notes made to Audenried, of $500 each, 'were presented for payment to the New Jersey Trust and Safe Deposit Company on April 29th, and there were no funds to the credit of the Haas Baking Company to pay them. Mr. Wilson deposited his own check for $1,003.08 on the 30th, and the two notes and the protest were then paid on that day. The check of Mr. Wilson used to pay these notes was drawn upon funds which had been received for insurance money, and checked out by him, and placed to his credit.

The dealings of the Haas Baking Company with the Eastern Milling and Export Company were as follows: The former company had bought most of its flour from the latter company. The arrangement was that there should be a settlement every Monday, or whenever a bill reached $500; that the Haas Baking Company was to give thirty or thirty-five day notes with Mr. Warr's personal endorsement. At the time of the fire the Eastern Milling and Export Company had received a note for $500, dated March 26th, and a note of similar date for $500, both of which notes had been discounted at the National Security Bank, probably on the day of their date. In addition to these notes the Haas Baking Company owed the Eastern Milling and Export Company for flour delivered in Camden before the fire the sum of $475.50, and for flour delivered in Philadelphia after the fire the sum of $476.50. No note was given for these items, amounting to $952.

Now, Mr. Locher, the treasurer of the Eastern Milling and Export Company, says that, about the latter part of April, he 'phoned Mr. Warr and told him that he wanted the account paid, and that Mr. Warr said he would pay it immediately. Mr.

Warr sent a check, dated May 1st, 1902, drawn to the order of the Eastern Milling and Export Company by the Haas Baking Company for the sum of $952. Before that check had been deposited, Mr. Locher says, he received a telephone message from Mr. Wilson, stating that if he (Locher) would send the check to him by messenger, he would take care of it. Mr. Locher says he sent the check, and the messenger returned with Mr. Wilson's check for the amount, which check was deposited in the bank and paid on May 8th by the New Jersey Trust and Safe Deposit Company.

This seems to have been paid by the New Jersey Trust and Safe Deposit Company out of a deposit made by Mr. Wilson on May 5th in the shape of his own check in favor of the Haas Baking Company. This check was drawn upon funds which Mr. Wilson had received from funds that Mr. Wilson had checked out to the New Jersey Trust and Safe Deposit Company, being portions of the insurance money.

The testimony shows that on April 19th the company suspended its business, and I think that it suspended its business not merely because of the want of a suitable place to carry it on, but because of the want of funds to do so. The suspension of business by reason of the occurrence of the fire would not have brought the company within the provision of section 64 of the Corporation act. It is, however, clear that at the time of the fire the company was heavily indebted, and the occurrence of the fire brought matters to a head. After a struggle of about ten days it was found to be impossible to continue the business. Actions for small amounts were begun against the company and there was no money to pay them until the insurance money was collected. Immediately after the occurrence of the fire the officers of the company expected to rebuild its plant and continue its business, but after the end of the Philadelphia experiment, and after actions began, I am satisfied that this project was regarded as hopeless. The debts were so large and the creditors began to be so clamorous for payment that the hopes of raising money to rebuild faded away. By the time the first installment of insurance was paid the only thought.

of ·the officers was to take care of particular creditors. Mr. Warr, the president, was personally liable as endorser upon the unmatured note of $2,500, held by the New Jersey Trust and Safe Deposit Company, and as endorser upon the notes of March 26th to the Eastern Milling and Export Company, and possibly as guarantor of the bill of $952 due to that company.

As soon as the insurance money began to come in it was promptly distributed. This dealing was inconsistent with the idea that the company thought of continuing the business, and is only explicable upon the theory that only some of the creditors should be paid in full, and that the officers should select the favored parties  The conclusion is irresistible that on the 26th of April the company had become insolvent, and it is also clear that it had suspended its ordinary business for want of funds to carry on the same.

On April 29th, the Audenried notes, drawn payable on demand, were presented to the New Jersey Trust and Safe Deposit Company. There were no funds to pay them until Mr. Wilson deposited his check for that amount. The money which paid the notes was, as already observed, insurance money.

It is insisted on behalf of Mr. Audenried that this payment was made in the ordinary course of business and cannot be recovered, even assuming that the Haas Baking Company was, at that time, insolvent.

I am aware that under the English bankruptcy statutes it has been held that a payment made in the ordinary course of business, even if made in contemplation of bankruptcy, if the payment is received in good faith, is not recoverable. Chancellor Williamson, in *Receivers of Peoples Bank* v. *Paterson Savings Bank, 10 N. J. Eq. (2 Stock.) 13, 18,* recognized this rule as applicable to insolvent companies under the section, now section 64 of our Corporation act. But the chancellor proceeded to remark that "it never entered into the head of any judge to say that a man, in contemplation of an act of bankruptcy, could sit down and dispose of all his effects to the use of different creditors, for that would be a fraud upon the acts of bankruptcy." And, again, the chancellor declared that the conduct then under

consideration was in violation of the Insolvent act, because its sole purpose was to give a creditor an advantage over other creditors. These remarks seem to fit the conduct of the officers of this corporation in distributing substantially all the effects of the company. When these demand notes were paid the company had ceased to do business, and the notes which were paid after protest were not paid in the ordinary course of business.

In my judgment there should be a decree for the recovery of these payments.

Next, in respect to the moneys paid to the Eastern Milling and Export Company. I am of the opinion that the payment of the bill for $952 was clearly violative of the statute. It was made after the company had consulted with the representative of Fleischmann & Company, a creditor, about the appointment of a receiver. The payments to this company were also made because Mr. Warr was understood to be a guarantor of the claim.

The circumstances concerning the payment of $352 in cash by Mr. Warr are too obscure to base a decree that that sum should be returned. It was not paid by check upon the insurance fund or any other funds of the company, so far as appears. Mr. Warr may have paid it out of the $500 he received, but it is not proved.

The feature which has caused me the most perplexity is the method in which the payment of the two promissory notes due the Eastern Milling and Export Company should be dealt with. One of these notes was paid April 26th and the other May 5th. These payments were made undoubtedly after insolvency and after suspension of the company's business. These payments would stand upon the same footing as those made to Audenried were it not for two distinctive features—*first,* the Eastern Milling and Export Company's notes had upon them the endorsement of Mr. Warr; and *secondly,* they had been discounted and were held by the discounting bank at the time of their payment.

The point is made that the party who received the money in payment of these notes was the discounting bank and not the Eastern Milling and Export Company, and that if anyone is liable to repay it is the bank.

I have concluded, however, inasmuch as the payment discharged the contingent liability of the Eastern Milling and Export Company, who was also an endorser, which company had received the money in advance by way of discount, that in equity, where circuity of action is avoided, the Eastern Milling and Export Company can be reached in this suit. This is the only way of accomplishing an equitable result. For if the bank be compelled to repay, it will have lost at law the benefit of the endorsement for want of notice of protest.

But the Eastern Milling and Export Company had also the endorsement of Mr. Warr, which it lost at law by failure to give notice, the failure being caused by the payment of the note. Now, inasmuch as Mr. Warr was cognizant, as president of the company, of the circumstances surrounding the payment, it would seem clear that he would not be permitted to set up his discharge as endorser. If Mr. Warr had been made a party to the bill, and a decree prayed against him, fixing his contingent liability, I am of the opinion that such a decree could have been made. And I see no reason why the Eastern Milling and Export Company cannot, in equity, have its redress over against Mr. Warr.

In the present shape of the litigation I think there should be a decree compelling the Eastern Milling and Export Company to return the payments, as already indicated.

The third suit involves the liability of the New Jersey Trust and Safe Deposit Company to repay the amounts applied by it in payment of the $2,500 note.

It is insisted on behalf of the New Jersey Trust and Safe Deposit Company that it had the right to pay its notes out of the insolvent company's funds on deposit, as this was merely an assertion of a right of set-off, the principle of which was established in the case of *Receiver* v. *Paterson Gaslight Co., 23 N. J. Law (3 Zab.) 283.* The facts in that case were that when the insolvent bank stopped doing business the gaslight company had on deposit with it $455.90. At that time the bank held a draft which had been accepted by the gaslight company. The receiver of the bank sued the gaslight company to recover the

full. amount of the draft, and the supreme court held that the gaslight company had a right to set off against this claim its right of action against the bank for the amount of its deposit. The counter claims existed at the time of the occurrence of insolvency, and at that moment the amount due either to or from the insolvent was the difference between the two claims.

Now, in the present case the Haas Baking Company had no claim against the bank at the time of its insolvency, nor at the time when it suspended business. At that time the New Jersey Trust and Safe Deposit Company held a sixty-day note for $2,500, made by the Haas Baking Company on April 6th. Upon it, as already observed, Mr. Warr was an endorser, and no doubt, because of that fact, the bank was selected as a preferred creditor.

On April 28th, Mr. Wilson says, at his suggestion, the sixty-days note was withdrawn and a demand note was substituted for it, which latter note was at once charged up to that day's deposit of insurance moneys.

Mr. Wilson says that the substitution of the demand note was made for the purpose of paying the $2,500 note, drawn at sixty days; that it was a form of receipt for our payment; that we could not get the other note as it was not due. Now, it is perceived that the right of the trust company to claim this deposit, unlike that in the cited case, arose after the insolvency of the company and after its cessation from business. Under these conditions no right of set-off came into existence. The transaction was a pure payment of the $2,500 note. Indeed, the circumstance in which this payment was made is analogous to the acts of the officers of the Peoples Bank in the case of *Peoples Bank* v. *Paterson Savings Bank, supra.* In that case the cashier of the insolvent bank handed over certain notes which belonged to the insolvent bank to a manager and trustee of the savings bank, a creditor. In this case the president and treasurer deposits money and directs it to be applied to the payment of the notes held by the New Jersey Trust and Safe Deposit Company, a creditor.

The principle applicable is observable in the way the courts deal with the acquisition by a debtor of an insolvent corporation

of claims against that corporation after its insolvency for the purpose of setting them off against a debt due to the insolvent corporation. The principle is that where there is a statute prohibiting preference or assignments after insolvency, that the date of insolvency fixes the time, and claims purchased thereafter cannot be set off, regardless of the date when a receiver is appointed. *Gluck & Beck. Rec. 470.*

In my judgment the bank must account for the $2,500 and interest so appropriated by it.