CRYSTAL BAY CORPORATION, Appellant, v. LEO F. SCHMITT, as Receiver of United Nevada Bank, a Corporation, Respondent.

No. 3222

August 5, 1938.                    81 P.(2d) 1070.

*Springmeyer & Thompson,* for Appellant:

*Platt & Sinai,* for Respondent:

**OPINION**

By the Court, TABER, J.:

This action was tried without a jury by the First judicial district court, Ormsby County. The agreed statement shows, in substance, the following facts:

Between September 22, 1931, and April 20, 1932, appellant (plaintiff in the court below) executed and delivered

to the United Nevada Bank its several promissory notes, secured by a mortgage of real property dated September 23, 1931. On November 18, 1932, the balance due on said indebtedness, principal and interest, aggregated approximately $25,000. On October 24, 1932, Esther A. Biltz deposited in said bank, as a savings account, the sum of $25,000. The bank carried on its usual and customary business until twelve o'clock noon of Saturday, October 29, 1932. Twelve o'clock noon of Saturday was the usual and customary hour at which all banks in the State of Nevada closed until the following Monday at ten o'clock in the morning. Before ten o'clock on the morning of Monday, October 31, 1932, the acting governor of the State of Nevada proclaimed each of the several week days commencing Tuesday, November 1, 1932, and ending Saturday, November 12, 1932, "for all intents and purposes business and banking legal holidays." After specifically excepting the courts and educational institutions, said proclamation proceeded, in part, as follows: "During which said days, and for such period, the payment of all debts and obligations of every nature and description, except the payment of taxes and obligations prescribed by statute, shall be suspended, and if by the terms of any document or written evidence of debt, the time of payment shall fall due within said period, then such time shall be extended for the full period of suspension herein proclaimed." By subsequent proclamations said holidays were extended to December 18, 1932.

From noon of Saturday, October 29, 1932, until the bank examiner took possession on December 12, 1932, neither the said United Nevada Bank nor any other state bank in the State of Nevada opened its doors to receive deposits or to allow withdrawals or to make payment of checks, and during said period of time such banks did not transact customary or usual banking business. During said period of time said bank was, and ever since has been, insolvent.

From November 1, 1932, until December 12, 1932, during customary hours of banking business, certain officers and employees of said United Nevada Bank were in its banking rooms in the city of Reno, Washoe County, State of Nevada, and opened the doors of said bank to admit any person who wished to discuss the financial condition of the bank or to enter the safe deposit vault or to leave any papers with officers or employees of said bank. No notice of the closing of said bank was posted on the doors of said banking building or on the banking premises of said bank during said period between October 29, 1932, and December 12, 1932, but it was generally understood by all depositors and creditors that said bank was not open for business; no court action to close said bank was then pending; the bank examiner of the State of Nevada was not then in charge of or in possession of said bank; and no court officer or other officer was then in charge of or in possession of said bank.

On November 18, 1932, said Esther A. Biltz duly assigned and transferred to plaintiff her said savings account in the said United Nevada Bank in the amount of $25,000, represented by United Nevada Bank savings passbook No. 764, which assignment duly was accepted by plaintiff; thereafter, and on November 25, 1932, plaintiff presented said assignment, in writing, to J. O. Walther, then and there the cashier of said bank, in the banking rooms of said bank, which said assignment the said cashier declined to acknowledge or recognize, and plaintiff also then and there presented to and left with the said J. O. Walther said savings deposit bank passbook No. 764, also a receipt for the amount of the deposit signed by said Esther A. Biltz, also a check drawn by said Esther A. Biltz upon said account of $25,000, in favor of plaintiff, which said check the said cashier declined to honor or recognize. Plaintiff then and there directed and requested that said United Nevada Bank apply the deposit shown by said passbook No. 764 toward the payment of the principal and interest

of said notes made by plaintiff to said United Nevada Bank, less any payments thereon; and further, plaintiff then and there demanded that said United Nevada Bank pay and cancel said mortgage. Said United Nevada Bank declined to deliver to or surrender to plaintiff or cancel the said notes or to satisfy the said mortgage, but the said J. O. Walther, cashier of said bank as aforesaid, on said November 25, 1932, in the said banking rooms of said bank, took the said passbook No. 764, the said receipt therefor signed by Esther A. Biltz, the said check for $25,000, and the said written assignment and demand for payment of said notes by said $25,000, and the said United Nevada Bank then and there gave said Esther A. Biltz and plaintiff a receipt for said passbook, check, assignment, letter demanding that said savings account be applied in payment of said promissory notes, and "Notes, Assignment, and Demand (Community property)." (Copies of the papers and documents for which said receipt was given are set forth in full in the agreed statement of facts.)

On December 12, 1932, the bank examiner of the State of Nevada, pursuant to statute, took physical possession and control of said bank and its assets, and continued in such possession and control until March 5, 1934. Plaintiff and said Esther A. Biltz demanded of said bank examiner that he deliver to and surrender to plaintiff said promissory notes and that he satisfy said mortgage, but he declined and refused to comply with said demand.

On February 28, 1934, defendant was appointed by said district court to be the receiver of said bank, qualified as such receiver on March 5, 1934, and ever since has been the duly appointed, qualified and acting receiver of said bank. Plaintiff and said Esther A. Biltz duly demanded that said receiver deliver and surrender said notes to plaintiff and satisfy said mortgage, but he refused and still refuses to comply with said demand, claiming and asserting that the said notes and mortgage

are unpaid and unsatisfied and are the property and assets of his said receivership.

After said refusals of the bank cashier, bank examiner and court receiver to comply with said demands of plaintiff and said Esther A. Biltz, plaintiff commenced this action in said district court, praying that said promissory notes be adjudged to have been fully paid, satisfied and discharged on November 18, 1932; that defendant be ordered to surrender and deliver said promissory notes to plaintiff; and that defendant be ordered to satisfy and discharge said mortgage. Defendant answered the complaint. Plaintiff demurred to said answer and moved to strike a portion thereof. The court overruled said demurrer and denied the motion to strike. The cause came on regularly for trial, and judgment was rendered for the defendant. Plaintiff moved for a new trial, which was denied, and this appeal has been taken by plaintiff from said judgment, and from the order denying a new trial.

The legislature of 1933 passed a new bank act. Stats. of Nevada 1933, chap. 190, pp. 292–332. But at the times the transactions constituting the subject matter of the instant case took place, the bank act of 1911 was in effect. Statutes of Nevada 1911, chap. 150, pp. 291–313; N. C. L. 1929, secs. 650–727. Sec. 23 of this act (N.C. L. 1929, sec. 672) reads as follows: "Any bank doing business under this act may place its affairs and assets under the control of the bank examiner by posting a notice on its front door as follows: 'This bank is in the hands of the state bank examiner.' The posting of such notice or the taking possession of any bank by the bank examiner shall be sufficient to place all of its assets and property of whatever nature in the possession of the bank examiner, and shall operate as a bar to any attachment proceedings, and the said bank shall be liquidated and its property and assets administered as in this act provided."

We quote also sec. 53 of said bank act of 1911 (N. C. L.

1929, sec. 702): "Whenever it shall appear to the examiner that any bank to which this act is applicable has violated its charter or any law of the state, or is conducting its business in an unsafe or unauthorized manner, or its capital is impaired, or it shall refuse to make the reports herein provided for, or refuse to permit its affairs to be examined by the examiner or his deputies or agents, or shall refuse to comply with any lawful requests or orders of the examiner or the state banking board; or shall suspend payment of its obligations; or if from any examination or report provided for in this act, the examiner shall have reason to conclude that such bank is in an unsafe or unsound condition to transact the business of banking, or that it is unsafe and inexpedient for such bank to continue in business, the examiner may forthwith take possession of the property and business of such bank and retain such possession until such bank shall resume business or its affairs be finally liquidated as herein provided. No bank, corporation, firm or individual knowing of such taking possession by the examiner, shall have a lien or charge for any payment, advance or clearance thereafter made, or liability thereafter incurred against any of the assets of the bank of whose property and business the examiner shall have taken possession as aforesaid. Such bank may, with the consent of the state banking board, resume business upon such conditions as may be approved by them."

Section 56 of said act (N. C. L. 1929, sec. 705) contains a provision that *after* the posting of the notice provided by said sec. 23 (N. C. L. 1929, sec. 672), or the taking possession of any bank by the examiner, no attachment, execution or other writ shall be levied upon the property or assets of such bank until such possession shall have been surrendered by the examiner in accordance with the provisions of the act.

Under the provisions of sec. 25 of said bank act of 1911 (N. C. L. 1929, sec. 674):

"A bank shall be deemed to be insolvent:

"First—When the actual value of its assets is insufficient to pay its liabilities;

"Second—When it is unable to meet the demands of its creditors in the usual and customary manner;

"Third—When it shall fail to make good its reserve as required by law."

Section 35 of the 1911 act (N. C. L. 1929, sec. 684), as amended, Stats. of Nevada 1931, chap. 35, p. 41, provides that: "No bank official shall give preference to any depositor or creditor by pledging the assets of the bank as collateral security or otherwise; provided, however, that any bank may secure funds deposited with such bank by the United States, state, or counties of the state by pledging acceptable assets of the bank as collateral security; provided further, that any bank may borrow money for temporary purposes, not to exceed the amount of its paid-up capital, and may pledge any of its assets as collateral security therefor; provided further, that when it shall appear that a bank is borrowing habitually for the purpose of conducting its business, the bank examiner may require such bank to pay off such borrowed money. Nothing herein shall prevent any bank from rediscounting in good faith and indorsing any of its negotiable notes."

The civil practice act of 1911, secs. 8500–9385, N. C. L. 1929, contains the following statutory provisions:

Section 8602 N. C. L. 1929: The answer of the defendant shall contain: * * * 2. A statement, in ordinary and concise language, of any new matter constituting a defense or counterclaim."

Section 8603 N. C. L. 1929, as amended, Stats. of 1931, chap. 148, p. 239:

"The counterclaim mentioned in the last section shall be one existing in favor of the defendant and against a plaintiff, between whom a several judgment might be had in the action, and arising out of one of the following causes of action:

"1. A cause of action arising out of the transaction set forth in the complaint as the foundation of the plaintiff's claims, or connected with the subject of the action.

"2. In an action arising upon contract, any other cause of action arising also upon contract and existing at the commencement of the action.

"3. In all actions now pending or which may hereafter be commenced, arising upon contract, wherein the plaintiff is a nonresident of the State of Nevada, or is insolvent, any other cause of action existing at the commencement of the action, except a cause of action founded upon a claim assigned after the commencement of the action."

Section 8605 N. C. L. 1929: When cross-demands have existed between persons under such circumstances that if one had brought an action against the other a counterclaim could have been set up, neither shall be deprived of the benefit thereof by the assignment or death of the other, but the two demands shall be deemed compensation, so far as they equal each other."

Section 8545 N. C. L. 1929: "In the case of an assignment of a thing in action, the action by the assignee shall be without prejudice to any set-off or other defense, existing at the time of, or before notice of, the assignment; but this section shall not apply to a negotiable promissory note, or bill of exchange, transferred in good faith, and upon good consideration, before due."

Further reference herein to any of the foregoing statutes will be by section number in the Nevada Compiled Laws of 1929.

Appellant does not contend that it would be entitled to offset the assigned savings deposit against its indebtedness to the bank if, before the assignment on November 18, 1932, the notice prescribed in sec. 672 N. C. L. 1929 had been posted, or the bank examiner had taken possession of the bank's property and business pursuant to sec. 702 N. C. L. 1929, or a court receiver for the

bank had been appointed. Appellant does contend, however, that as none of these three things was done, it was legally entitled to the set-off in the absence of a statute to the contrary; and it contends that there was no such statute in effect in 1932.

Respondent concedes that appellant would be entitled to such set-off if, at the time of the assignment and demand for set-off, there had been no statute making such set-off unlawful. He takes the position, however, that the allowance of the set-off would have violated certain provisions of said sec. 684 and of sec. 1644 N. C. L. 1929.

Appellant's position on this appeal may be briefly stated as follows: Through the assignment from Mrs. Biltz, appellant acquired a vested legal right of set-off—a right which it was legally entitled to acquire any time up to December 12, 1932, when the bank examiner took possession of the property and assets of the bank and posted the statutory notice on the front door. The bank was not legally closed or legally insolvent until said last-mentioned date. Plaintiff's accrued right of set-off was not affected by the bank's insolvency, by the fact that all parties concerned had notice of such insolvency, nor by the bank's ceasing to accept deposits, pay checks, or transact usual and customary banking business. Under the maxim "expressio unius est exclusio alterius," secs. 672, 702 and 705 of the Nevada Compiled Laws 1929 manifest the legislative intent that attachments, executions and other writs may be levied on the property and assets of a bank at any time before its officers post the statutory notice of insolvency on the front door, or the bank examiner takes possession of its property and assets, or a court receiver is appointed. In the instant case "the bank wanted to have all the benefits of closing, without the penalties, and wanted to have a sort of rest period in which it would not be obliged to pay any of its debts and perhaps work out some scheme whereby it wouldn't have to finally close

its doors." The allowance of the set-off would not violate the provisions of either sec. 684 or sec. 1644 N. C. L. 1929; and said sec. 1644, which is a section of the general corporation law, does not apply to banks at all. Mrs. Biltz and plaintiff should not be penalized because they were diligent and vigilant in pursuit of their legal rights. The deposits of the bank did not become a trust fund until the bank examiner took possession and posted notice of insolvency on December 12. Those decisions in other jurisdictions which do not permit bank set-offs during insolvency are based upon federal and state statutes entirely different from the Nevada statutes in effect in 1932. A set-off is not a preference. The bank holiday proclamation did not in any way affect plaintiff's right to a set-off. The allowance of plaintiff's set-off would not contravene the rule of equality. In general, set-offs may be acquired during debtors' insolvency; and there is no magic about insolvency which ipso facto cuts off either attachment or set-off. Except where there is a statute to the contrary, the rule as to set-offs acquired during the insolvency of debtors is the same whether applied to private persons, nonbanking corporations, or banking corporations. In other jurisdictions where the statutory law is similar to that of Nevada during 1932, the great weight of authority supports plaintiff's right of set-off in the instant case.

■ Appellant puts forward several reasons in support of its contention that the set-off claimed would not constitute the giving of a preference within the meaning of the first part of amended sec. 684 N. C. L. 1929, which is the statutory provision chiefly relied upon by respondent. In the first place, plaintiff interprets this provision as prohibiting only preferences by *pledging* the assets of the bank, and points out that a set-off, or the allowance of a set-off, is not a pledge. According to this interpretation the wording would be, "No bank official shall give preference to any depositor or

creditor by pledging the assets of the bank as collateral security or otherwise pledging such assets." We think, however, that the word "otherwise" refers back to the words "give preference to any depositor or creditor," not to the words "pledging the assets of the bank"; and that the preferences prohibited by said statutory provision are not confined to pledges. In the recent case of Dellamonica v. Lyon County Bank Mortgage Corporation, 58 Nev. 307, 78 P. (2d) 89, the transaction involved, which took place after the 1931 amendment to said sec. 684, was not a pledge, but was nevertheless condemned as a preference under the statutory provision now under consideration.

■ Appellant further argues that the allowance of the set-off claimed by plaintiff would not be giving a preference within the meaning of said amended sec. 684 because it does not call for any affirmative act on the part of the debtor. "Hence, the inactive, passive, condition of the bank while it is being acted upon, so to speak, by way of a set-off or by way of an attachment, execution, or any lien is not a preference." We cannot concur in this view. In the case of Venango National Bank v. Taylor, 56 Pa. 14, at pages 16, 17, the court had under consideration sec. 52 of the act of Congress of June 3, 1864, 13 Stat. 115, 12 U. S. C. A. sec. 91 (banking act). In the course of its opinion the court said: "We cannot assent to the argument that it was intended for no more than to avoid all acts of the bank itself, all voluntary transfers by it of its notes, bonds, deposits, etc., with a view to giving preferences. Its language is general, as applicable to legal as to voluntary transfers. But if the deposit made by John Rynd can be set off against the bond-debt due by Taylor to the bank, what is it but a transfer of the bond-debt to the satisfaction of a creditor, thus giving him a preference? It is not contended that the bank was not prohibited from doing this, but it is insisted the transfer may be accomplished by an adversary proceeding at the suit of Rynd for the

use of Taylor. It is not denied that Rynd, had he made no assignment of his claim, could not have obtained payment of the debt due him by calling upon the bank after the 27th day of March, 1866, when its doors were closed, and when it suspended payment. The bank, it is conceded, was not at liberty to transfer to him either their claim against Taylor or any of their assets, or to pay him any money: and if so, can the thing be secured by a hostile proceeding? Will the law compel a payment or a transfer which the law prohibits a debtor from making?" And see Stone v. Dodge, 96 Mich. 514, 56 N. W. 75, 21 L. R. A. 280.

As a third reason why said sec. 684 does not make plaintiff's claim of set-off invalid, appellant states that, unless prohibited by statute, a preference even in insolvency is valid. "Thus, payments made to alert and vigilant depositors during a run on an insolvent bank are valid." It is to be observed, however, that the rule just stated applies where the payments are made in the ordinary course of business. In the case at bar the bank, at the time of the assignment, was not open for business.

At noon on October 29, 1932, and at all times thereafter, the United Nevada Bank was insolvent. When the assignment was made, the bank's insolvency was known not only by its officers but by plaintiff, Mrs. Biltz, and the public generally. At all times after October 29, 1932, the bank was closed for business and had ceased accepting deposits, paying checks or doing a regular banking business. It was not a going concern, and had committed an act of insolvency. We have reached the conclusion that the bank properly declined to allow the set-off, for the reason that to have done so would have constituted a violation of the provisions of the first part of said amended sec. 684 N. C. L. 1929. Sloss v. Taylor, 182 Ark. 1031, 34 S. W.(2d) 231; Miller v. Audenried, 67 N. J. Eq. 252, 57 A. 1076; Kennedy v. New Orleans Sav. Inst., 36 La. Ann. 1;

Schlesinger v. Goldberg, 47 Misc. 149, 93 N. Y. S. 592; Davis v. Knipp, 92 Hun 297, 36 N. Y. S. 705; Stone v. Dodge, supra; Venango National Bank v. Taylor, supra; Robinson v. Aird, 43 Fla. 30, 29 So. 633; Kullman & Co. v. Woolley, 5 Cir., 83 F.(2d) 129.

After October 29, 1932, Mrs. Biltz could not have lawfully withdrawn her deposit; and she could not, by her assignment on November 18, 1932, give plaintiff any greater rights than she herself had, particularly where, as in this case, plaintiff, as well as Mrs. Biltz and the bank, knew of the bank's insolvency, that it was closed for business, was no longer conducting a regular banking business, and was not a going concern.

Appellant contends that most of the decisions tending to support respondent's position were based upon statutes differing entirely from those of Nevada; but it must be borne in mind that while we are considering the set-off provisions of the civil practice act, we are not permitted to overlook the section of the 1911 banking act which prohibited preferences to depositors or creditors. It is true that differences exist in the statutes of the various jurisdictions relating to preferences as well as to set-offs; but the fact remains that when the transactions involved in this case took place, there was in effect a Nevada statute prohibiting bank officials from giving preferences to depositors or creditors.

In Luikart v. Hunt, 124 Neb. 642, 247 N. W. 790, 792, the court said: "The funds of depositors are received by a banking corporation with the knowledge and notice given by this wise principle of the law, not only to the officers of the bank, but to every depositor, that all assets of the bank, which are largely created by these deposits, will always be a fund subject to pro rata repayment to the depositors, whenever the bank ceases to function as a going concern and to pay its depositors in the ordinary course of business."

We quote the following from Citizens' State Bank of Chautauqua v. First Nat. Bank of Sedan, 98 Kan. 109, 157 P. 392, 395, L. R. A. 1917A, 696: "For reasons of

public policy the Legislature saw fit to safeguard the interests of depositors and other creditors of banks by enacting regulations controlling the operation of banks and limiting their power to prefer one creditor over another at a time when the bank is insolvent.   *   *   * From the time a bank becomes insolvent all creditors stand on an equal footing as to assets on hand.   Those creditors who were diligent when the bank was solvent are permitted to retain the benefits of securities surrendered then.   The moment a bank becomes insolvent its assets become a trust fund for the pro rata payment of the claims of all its creditors."

Appellant has cited a large number of cases, but places most reliance on the following:   Nix v. Ellis, 118 Ga. 345, 45 S. E. 404, 98 Am. St. Rep. 111; Johnston v. Humphrey, 91 Wis. 76, 64 N. W. 317, 51 Am. St. Rep. 873; Bank of Leipsic v. Kreinbrink, 50 Ohio App. 404, 198 N. E. 498; O'Connell v. Holbrook, 270 Mich. 643, 259 N. W. 349.   The first three of these cases do not discuss preferences or refer in any way to statutory provisions prohibiting the giving of preferences by banks or banking officials to depositors or creditors.   In the last of said cases, O'Connell v. Holbrook, copartners conducted a private banking business under the name and style of the Bank of Hubbardston.   After the bank closed, but before the receiver was appointed, plaintiff purchased certain certificates of deposit and asked to have them set-off against his indebtedness to the bank. The set-off was allowed, but attention is called to the following language in the opinion:   "Defendants appeal from a decree granting the set-off and discharging plaintiff's indebtedness, claiming the bank was insolvent at the time it closed; that it was a bank within the meaning of the statute against preferential payments; that the definition of insolvency is the same for a private bank, owned by a copartnership, as for an incorporated bank; and that plaintiff was not entitled to have setoff made after insolvency of the bank.   The general banking statutes are not applicable.   The so-called bank

was a business endeavor of the partnership and was not insolvent apart from insolvency of all the copartners. First National Bank & Trust Co. v. Storms, 265 Mich. 453, 251 N. W. 576. Insolvency of the copartners, and not merely of the bank, was for the receiver to establish, and such was not properly shown. Mr. Fitzpatrick had a right to transfer to plaintiff the certificate obligations of the partnership and plaintiff had a right to have the set-off made. The case does not fall within the rules and statutory provisions applicable to incorporated banks."

The case just quoted from (O'Connell v. Holbrook) is more helpful to respondent than appellant, because it lends support to the proposition that the set-off provisions of the civil practice act should not be permitted to override banking statutes which forbid the giving of preferences by banking officials to depositors or creditors. The United Nevada Bank was a banking corporation, and the provisions of sec. 684 N. C. L. 1929, as amended, were clearly applicable to it. O'Connell v. Holbrook plainly intimates that if the banking statutes forbidding preferential payments had been applicable in that case, the set-off might not have been allowed.

Appellant claims that three decisions of this court tend to support, by analogy, its position in the instant case: Irving National Bank v. District Court, 47 Nev. 86, 217 P. 962; E. H. Beemer v. E. J. Seaborn, 54 Nev. 459, 22 P.(2d) 356; Organ v. Winnemucca State Bank & Trust Co., 55 Nev. 72, 26 P.(2d) 237. In the Irving case the insolvent was not a banking corporation, and there was therefore no question as to whether the provisions of said sec. 684 N. C. L. 1929, as amended, were applicable. In the Beemer case the motion to dissolve and discharge the writ of attachment was based upon numerous grounds, only one of which is mentioned in this court's opinion on the appeal in that case. The decision of this court in that case was based solely upon the ground that if the writ was levied at all, it was

after the money and property of the bank had been taken possession of by the state bank examiner, pursuant to law. The Organ case involved the pledging of assets of a state bank as security for money borrowed in excess of its paid up capital. This transaction took place before the bank closed its doors, while it was a going concern and doing a regular banking business. This court held that, as the lender acted in good faith, the pledging of the bank's assets was valid as against the bank and its receiver. We have given these cases careful consideration, but we are of the opinion that our decision in the case at bar is not inconsistent with any of them.

The views herein expressed make it unnecessary to decide whether sec. 1644 N. C. L. 1929, applies to banks, or, if so, whether the allowance of the set-off would contravene its provisions.

The conclusion arrived at by the court has not been influenced in any respect whatsoever by the executive proclamation purporting to set apart certain days in November and December 1932 as banking and business holidays.

The judgment and order appealed from are affirmed.

### ON PETITION FOR REHEARING

October 20, 1938.                    83 P.(2d) 464.

*Springmeyer & Thompson,* for Appellant.

*Platt & Sinai,* for Respondent.

## OPINION

By the Court, TABER, J.:

■ ·Appellant contends that sec. 684 N. C. L. 1929, even when construed independently of other sections of the bank act of 1911, indicates the intent of the legislature to protect depositors and creditors against only fraudulent and improper acts of the bank officials during the insolvency of a bank, which acts would result in the preferment of special friends of said officers among the depositors. To go further, argues appellant, is to add something that the legislature did not say, and did not intend. Putting it in another way, the language, says appellant, must be warped and strained if the interpretation put upon said section by this court is to be upheld. We think what was said in our original opinion is a sufficient answer to the aforesaid contention. It is true that the section in question does protect depositors and creditors against fraudulent and improper acts of bank officials, which would result in the preferment of special friends of such officials. But

we are satisfied that the purpose of sec. 684 goes much further, and that its chief purpose is to protect depositors and creditors against the giving of preferences by bank officials, whether their conduct be accompanied by actual fraud on the one hand, or only constructive fraud on the other. First National Bank & Trust Co. v. Manning, 116 Conn. 335, 164 A. 881. This view is supported by a large number of authorities, including statements in the opinions in two cases cited by appellant; Hadlock v. Callister, 85 Utah 510, 39 P. (2d) 1082; Citizens State Bank of Chautauqua v. First National Bank of Sedan, 98 Kan. 109, 157 P. 392, L. R. A. 1917A. 696. We quoted from Citizens' State Bank v. First National Bank, supra, in our former opinion. We now quote from the opinion in Hadlock v. Callister, supra, 39 P. (2d) 1085: "In the conduct of a banking business, other peoples' moneys are solicited and received by the bank to be used and invested by it for the benefit and profit of its stockholders. The confidence and integrity of a bank and its ability to properly safeguard the money thus intrusted to it is a necessary asset to its continued existence. Such confidence only can be sustained by adopting and practicing the policy of equity of treatment between depositors with preferences to none. Any practice which tends to destroy that confidence should not be permitted. * * * The policy of the law is to provide a maximum of protection and equality of treatment to all depositors."

■ Appellant, in its petition, renews its contention that when sec. 684 N. C. L. 1929 is construed in relation to secs. 672 and 705 N. C. L. 1929 (quoted in our original opinion), it is even more evident that it was not the intent of the legislature to prohibit the acquisition of a preferential position by a wholly adversary proceeding during the insolvency of the bank, but before it has formally closed pursuant to law. Appellant apparently considers if an established rule, under such statutes as ours, that a depositor or other creditor of

a bank may sue and attach its assets or levy execution against such assets at any time prior to the occurrence of either of two events: (1) The voluntary closing and posting a notice on the front door by the bank, (2) the taking possession of the bank by the bank examiner. While we do not consider it necessary to decide this question in the instant case, we do say that, in our opinion, it is not an established rule of law, even under such statutes as said secs. 672 and 705 N. C. L. 1929, that, in a situation such as that presented in this case, the depositor or her assignee could successfully sue and attach the assets of the bank. In so saying, we have in mind the case of Crane v. Pacific Bank, 106 Cal. 64, 39 P. 215, 27 L. R. A. 562. This case was cited in the original briefs on appeal herein, but was dismissed by appellant with the statement that it "held invalid an attachment against a bank *after* the bank, in accordance with the order of the state banking commissioners, had closed its doors and gone into liquidation."

In the California reports the first paragraph of the syllabi reads as follows: "The assets of an insolvent bank are to be administered exclusively under the Bank Commissioners' Act for the benefit of all the depositors and creditors of the bank, as well as its stockholders; and where a commercial bank has suspended and closed its doors, owing to insolvency in fact, the right of attachment by a depositor or creditor of the bank does not exist, and such an attachment will be dissolved although levied before the machinery of the Bank Commissioners' Act was put in motion by the commencement of an action by the people." 106 Cal. 64, 39 P. 215, 27 L. R. A. 562.

From the opinion we learn the following facts: The bank "closed its doors for business, and wholly suspended payment of its debts, dues, and liabilities, on the 23d day of June, 1893, and has not since resumed payment; that on said last-mentioned day said bank held in trust for persons, partnerships, and corporations

an aggregate fund amounting to about $1,868,041.45; that, prior to the said last-mentioned day, said bank commissioners examined said bank, and found that it had been guilty of a violation of law in conducting business contrary to its articles of incorporation in an unsafe manner, and so as to seriously jeopardize the capital, property, and business of the bank, and thereupon directed it, by an order addressed to it, to discontinue such illegal and unsafe practices, and to conform to the requirements of its charter, but that the bank refused and neglected to comply with said order; that on said 23d day of June, 1893, the indebtedness of said bank was largely in excess of the reasonable and actual value of its assets; that the entire capital stock, together with the surplus, had become completely exhausted, and that the directors and stockholders neglected and refused to pay in said depleted stock, or any part of it, and 'that on said 23d day of June, 1893, said Pacific Bank was wholly insolvent and remains so insolvent'; that the commissioners reported the condition of the bank to the attorney general, as required by law; that said attorney general commenced an action in the superior court on the 14th day of October, 1893, entitled, 'The People of the State of California v. The Pacific Bank, a Corporation, et al.,' in which action it was decreed on November 3, 1893, that said bank was insolvent, etc., and enjoining it and its officers from transacting any further business."

In the course of its opinion the supreme court of California said in part: "It needs no argument to show that the exercise of the sovereign power of the state over such corporations in the manner above indicated is intended for the protection, not only of the stockholders, but especially for the protection of depositors and all others transacting business with or through the bank. * * * If the bank commissioners' act operates to take banks out of the operation of the insolvency act, the proceedings under which, though summary and

expensive, result in the equal distribution of its assets among its creditors, it is equally clear that it was not intended that the moment a bank closed its doors its assets should be the prey of the first creditors who should secure the issuance of attachments, and thus permit its assets to be converted into money by a still more expensive process, and that the proceeds should be applied to the payment in full of these attachments, leaving other creditors, who, by reason of distance or otherwise, should not be informed of the bank's condition, or be able to secure the prompt issuance of an attachment, wholly without a right to share in its assets. * * * Appellant contends, however, that the right of attachment is a positive statutory right, and that the bank commissioners' act makes no provision for dissolving attachments levied before the machinery of the act was put in motion by the commencement of the action by the people. But, before the attachment was levied, the bank had suspended and closed its doors. The affidavits in support of the motion not only state that fact, but also that it was in fact insolvent, and these facts are not denied. Under these circumstances, the right of attachment did not exist. * * * It requires no argument to show that the right of attachment under the provisions of the Code of Civil Procedure is inconsistent with the machinery of the bank commissioners' act, as well as with its obvious purpose and intent. The state never intended that after the continued exercise of its high prerogative powers for the safety of all depositors and creditors, as well as stockholders, its purpose should be thwarted by the seizure of the assets of the bank by one or more creditors * * *."

Crane v. Pacific Bank, supra, was an appeal from an order dissolving an attachment. The motion was made in the superior court on November 17, 1893. On the hearing of the motion, the movant offered in evidence the records and papers in People v. Pacific Bank, the

case commenced by the attorney-general in the superior court on October 14, 1893, and in which said court decreed on November 3, 1893, that the bank was insolvent and enjoined it from transacting any further business. On the hearing of the motion to dissolve the attachment, the plaintiff excepted to the action of the lower court in receiving the complaint, answer and decree in said case of People v. Pacific Bank. On appeal to the supreme court from the order dissolving the attachment, the latter court ruled that said papers were properly in evidencce on the hearing of the motion to dissolve in the lower court. In connection with this ruling, the court made this significant statement (Crane v. Pacific Bank, supra, 106 Cal. 64, at page 72, 39 P. 215, at page 218, 27 L. R. A. 562) : "If it were otherwise, since the affidavit of Mr. Gerberding that the bank was in fact insolvent on June 23d, and ever since remained so, was not controverted, the order dissolving the attachment might have been properly sustained without the evidence excepted to, and, if so, appellant was not prejudiced by its admission."

The rule announced in Crane v. Pacific Bank, supra, is adopted in the first two sentences of the text of sec. 187, 4 Cal. Jur. 307. In the case of Dodson v. Wightman, 6 Kan. App. 835, 49 P. 790, cited by appellant in the instant case, the court did not question the rule laid down in Crane v. Pacific Bank, supra, but expressed the opinion that the Crane case was not applicable, as will be seen by the following language in the opinion in the Kansas case [page 792] : "It will be proper to bear in mind that this bank was not authorized to do business, and that any general doctrine as to public policy in respect to authorized banks would not be applicable to the bank in question. Hence we think the decision of the supreme court of California in Crane v. Pacific Bank [106 Cal. 64]; 39 P. 215 [27 L. R. A. 562], which is cited by the attorney general, is not applicable to this case."

■ Appellant takes the position that Mrs. Biltz could have commenced action and attached the assets of the bank to compel the bank to allow her to withdraw her deposit, and that, therefore, it cannot properly be said that, in assigning her deposit to appellant, she was attempting to transfer greater rights than she herself had. But it is this court's opinion that if the bank had allowed Mrs. Biltz to withdraw her deposit after October 29, 1932, it would have been giving her a preference within the meaning of sec. 684 N. C. L. 1929. 7. Am. Jur. 519, sec. 717, nn. 12 and 13. Likewise it would have been giving a preference to appellant had the bank allowed it to offset the deposit assigned to it by Mrs. Biltz against its indebtedness to the bank.

It must be borne in mind that, in the instant case, the main question is whether the bank would have violated the provisions of sec. 684 N. C. L. 1929, if it had allowed the set-off demanded by appellant. At the time the set-off was demanded, the bank was insolvent in fact, had closed its doors, was not a going concern, was not paying checks, allowing withdrawals, or otherwise engaging in any of the usual transactions in the course of a regular banking business. In determining whether the allowance of the set-off would have constituted the giving of a preference, the foregoing facts, and the further fact that they were known to all parties concerned at the time of the assignment, are of more compelling and controlling force than the facts that no notice had been posted on the front door of the bank, the bank examiner had not taken possession, and no receiver had been appointed at the time of the assignment. We cannot, in the face of sec. 684 N. C. L. 1929, subscribe to a doctrine which, in a situation such as that presented by the facts and circumstances in this case, would allow a bank to give an unfair advantage to one general depositor or creditor simply because a bank examiner failed in his duty to take over the assets when he should have done so, or because the bank officials failed in their duty

to post a notice on the front door of the bank when it ceased doing a regular banking business.

When appellant requested or demanded the allowance of the set-off, the bank knew that it was insolvent and that it could not pay all its depositors and creditors in full; it thus knew that compliance with appellant's demand would give it a preference over other depositors and creditors, because appellant would in effect receive the full amount of its assigned deposit, whereas other general depositors and creditors, and particularly those not so situated as to be able to know the facts or take speedy action, would receive only their ratable proportion of what was left. The bank officials could not, therefore, have allowed the set-off without *intentionally* giving appellant an unfair advantage over other general depositors and creditors. Roberts v. Hill C. C. 24 F. 571; Hadlock v. Callister, supra; Singac Trust Co. v. Totowa Lumber & Supply Co., 112 N. J. L. 99, 169 A. 673; Annotation, 74 A. L. R., page 941; 9 C. J. S. Banks and Banking, page 948, 949, sec. 487, n. 55; Tiffany on Banks and Banking, secs. 87–88.

The petition for rehearing is denied.